ORAL ARGUMENT NOT YET SCHEDULED

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

Nos. 25-1255 (lead) and 25-1268
(Consolidated)

READING INTERNATIONAL, INC.,
*Petitioner*

v.

SURFACE TRANSPORTATION BOARD AND
UNITED STATES OF AMERICA,
*Respondents*

CITY OF PHILADELPHIA,
*Intervenor*

ON PETITION FOR REVIEW OF DECISION BY THE
SURFACE TRANSPORTATION BOARD

# FINAL BRIEF OF READING INTERNATIONAL, INC.

Dominic Draye
*Counsel of Record*
GREENBERG TRAURIG, LLP
2101 L Street, N.W., Suite 1000
Washington, DC 20037
(202) 331-3168

John Voorhees
GREENBERG TRAURIG, LLP
1144 15th Street, Suite 3300
Denver, CO 80202
(303) 685-7465

Jennifer Bartlett
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, TX 75201
(214) 665-3729

*Counsel for Reading International, Inc.*

June 22, 2026

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Reading International, Inc. submits this provisional certificate as to parties, rulings and related cases, based on the knowledge and information reasonably available to Petitioner at the time of filing.

### A. Parties, Intervenors, and Amici Curiae

Petitioner in this matter is Reading International, Inc. Reading International, Inc., through its subsidiary RCPA, LLC (formerly known as Reading Company), owns the rail property at issue in the underlying action before the Surface Transportation Board.

Respondents in this matter are the Surface Transportation Board and the United States of America.

The City of Philadelphia is an intervenor in this matter.

### B. Ruling under review

The ruling under review is a Decision dated September 24, 2025, by the Surface Transportation Board in Docket No. FD 36768.

### C. Related cases

This case has been consolidated with *Strohmeyer v. STB, et al.*, Case No. 25-1268. Petitioner is not aware of other related cases currently pending in any other court.

## RULE 26.1 CERTIFICATE OF CORPORATE DISCLOSURE FOR READING INTERNATIONAL, INC.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Reading International, Inc. states that it is a diversified company focused on the development, ownership and operation of entertainment and real property assets in the United States, Australia, and New Zealand. Reading International, Inc. has no corporate affiliates and/or parent corporation, and no publicly held corporation owns 10% or more of the stock of Reading International, Inc.

## TABLE OF CONTENTS


CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..... i

A. Parties, Intervenors, and Amici Curiae ..... i

B. Ruling under review ..... i

C. Related cases ..... i

TABLE OF CONTENTS ..... iii

GLOSSARY ..... ix

JURISDICTIONAL STATEMENT ..... 1

STATUTES AND REGULATIONS ..... 1

ISSUES PRESENTED ..... 2

INTRODUCTION ..... 4

STATEMENT OF THE CASE ..... 8

I. Factual Background ..... 9

II. Procedural History ..... 17

SUMMARY OF THE ARGUMENT ..... 20

STANDING ..... 22

ARGUMENT ..... 22

I. The STB's Decision that Conrail's Abandonment of Its Operating Easement Constituted an Abandonment of Reading's Residual Interests on the Ninth Street Branch Was Arbitrary, Capricious, and Contrary to Law. ..... 22

A. The STB misconstrued the scope and effect of Conrail's 1983 abandonment. ..... 23

B. Reading's remaining interest in the Ninth Street Branch falls under the STB's jurisdiction. ..... 27

C. The STB erred by failing to explain why Reading's interests do not qualify as a rail line under the STB's jurisdiction ..... 29

D. The STB failed to recognize Reading's residual and retained interests, disregarding substantial evidence in the record.......... 32

II. The STB's Disregard of Relevant District Court Authority Rendered Its Decision Arbitrary, Capricious, and Contrary to Law. .......... 40

A. The *Scioli Turco* decision is directly on point. .......... 40

B. The STB failed to distinguish or explain its departure from this authority, which was arbitrary and capricious.......... 41

III. The STB's Decision Would Require Reading to Petition for Relief to Preserve Residual Rights When There Is No Such Requirement Under the Law. .......... 45

CONCLUSION .......... 48

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Agilent Techs., Inc. v. Affymetrix, Inc.*,
567 F.3d 1366 (Fed. Cir. 2009) .......... 41

*Astoria Fed. Sav. & Loan Assn. v. Solimino*,
501 U.S. 104 (1991) .......... 24

*Baros v. Tex. Mexican Ry. Co.*,
400 F.3d 228 (5th Cir. 2005) .......... 47

*Booth v. Fletcher*,
101 F.2d 676 (D.C. Cir. 1938) .......... 13

*Matter of Boston & Maine Corp.*,
596 F.2d 2 (1st Cir. 1979) .......... 27

*City of Austin, Texas-Acquisition-Southern Pacific Transportation Co.,* F.D. No. 30861(A), 1986 WL 1166762 (ICC Nov. 4, 1986) .......... 27

*City of S. Bend v. Surface Transp. Bd.*,
566 F.3d 1166 (D.C. Cir. 2009) .......... 9

*Coniglio v. Garland*,
556 F. Supp. 3d 187 (E.D.N.Y. 2021) .......... 41

*CSX Transp., Inc. v. City of Sebree*,
924 F.3d 276 (6th Cir. 2019) .......... 47

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) .......... 39

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......... 39

*Flores v. Sec'y of Health, Educ. & Welfare*,
228 F. Supp. 877 (D.P.R. 1964) .......... 42

*Fox v. STB*,
379 Fed. Appx. 767 (10th Cir. 2010) .......... 37, 44

*Jicarilla Apache Nation v. U.S. Dep't of Interior*,
613 F.3d 1112 (D.C. Cir. 2010) .......... 45

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2025) .......... 26, 41-42

*Merck Co. v. Reynolds*,
559 U.S. 633 (2010) .......... 24

*Mitchell v. Hawley*,
83 U.S. 544 (1872) .......... 24

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 34

*Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.*,
158 F.3d 135 (D.C. Cir. 1998) .......... 46

*New York Cross Harbor R.R. v. Surface Transp. Bd.*,
374 F.3d 1177 (D.C. Cir. 2004) .......... 23, 30-31, 48

*New York v. Meta Platforms, Inc.*,
66 F.4th 288 (D.C. Cir. 2023) .......... 13

*Preseault v. United States*,
100 F.3d 1525 (Fed. Cir. 1996) .......... 24

*R.R. Ventures, Inc. v. Surface Transp. Bd.*,
299 F.3d 523 (6th Cir. 2002) .......... 27

*Reading Co. v. City of Philadelphia*,
823 F. Supp. 1218 (E.D. Pa. 1993) .......... 25, 33

*Riffin v. Surface Transp. Bd.*,
592 F.3d 195 (D.C. Cir. 2010) .......... 30

*Scioli Turco, Inc. v. Philadelphia & Reading R.R. Co.*,
2023 WL 7646535 (E.D. Pa. Nov. 14, 2023) 2, 7, 9, 14-15, 40, 42-43, 46

*Snohomish Cnty., Washington v. Surface Transp. Bd.*,
954 F.3d 290 (D.C. Cir. 2020) .......... 29-30

*Trustees of Diocese of Vermont v. State*,
145 Vt. 510, 496 A.2d 151 (1985), *aff'd sub nom Preseault v. I.C.C.*, 494 U.S. 1 (1990) .......... 37

*Unit Petroleum Co. v. Veitch*,
79 F. Supp. 3d 1234 (N.D. Okla. 2015) .......... 24

*United States v. Gorham*,
536 F.2d 410 (D.C. Cir. 1976) .......................................................... 13

*United Transp. Union-Illinois Legislative Bd. v. I.C.C.*,
52 F.3d 1074 (D.C. Cir. 1995) .......................................................... 37

**Administrative Cases**

*Angeles A. Zorzi, Tr. of the Angeles A. Zorzi Living Tr., & Antonio Aja, Jr. & Virginia D. Aja, Trustees of the Antonio Aja, Jr. Tr. & the Virginia D. Aja Trust Petition for Declaratory Order*, No. FD 36016, 2017 WL 431330 (S.T.B. Jan. 30, 2017)..................................................................... 6, 38

*Assets of CSX Transp., Inc.*,
No. F.D. 35312, 2009 WL 6408804 (S.T.B. May 3, 2009)................... 35

*Beaufort R.R. Co., Inc.--Modified Rail Certificate*,
No. F.D. No. 34943, 2009 WL 2170143 (S.T.B. July 20, 2009) .... 28, 46

*Bhd. of Locomotive Engineers, et al. v. Staten Island Rapid Transit Operating Auth.*,
360 I.C.C. 464 (I.C.C. 1979), *aff'd sub nom. Staten Island Rapid Transit Operating Auth. v. I.C.C.*, 718 F.2d 533 (2d Cir. 1983) ........ 35

*Consol. Rail Corp.-Abandonment Exemption-in Hudson Cnty., N.J. CSX Transp., Inc.-Discontinuance of Serv. Exemption-in Hudson Cnty., N.J. Norfolk S. Ry. Co.-Discontinuance of Serv. Exemption-in Hudson Cnty., N.J.,* No. AB 167, 2022 WL 3595013 (S.T.B. Aug. 18, 2022) .... 6, 37-38

*Joseph R. Fox—Petition for Declaratory Order*, No. FIN 35161, 2009 WL 1383503 (S.T.B. May 13, 2009) ............................... 37

*Midwest Generation, LLC-Exemption from 49 U.S.C. 10901-for Constr. in Will Cnty., Il Midwest Generation, LLC-Petition for Line Crossing Auth. Under 49 U.S.C. 10901(d)*, No. 34060, 2002 WL 437218 (S.T.B. Mar. 20, 2002), modified, Fed. Carr. Cas. (CCH) ¶ 37107 (S.T.B. Oct. 3, 2002)... 31, 35

*Norfolk & W. Ry. Co.--Abandonment Exemption--Between Kokomo & Rochester in Howard, Miami, & Fulton Ctys., in*,
No. AB-290, 2005 WL 1030535 (S.T.B. May 3, 2005) ........................ 38

*Pinelawn Cemetery Petition for Declaratory Order*, No. FD 35468, 2015 WL 1813674 (S.T.B. Apr. 20, 2015) .......... 43

*Tesoro Ref. & Mktg. Co., LLC Petition for Declaratory Order*, No. FD 36041, 2016 WL 6809953 (S.T.B. Nov. 14, 2016) .......... 44

*Victor Wheeler, et al.--Petition for Declaratory Order--Rail Line in Erie Cnty., Pa Bessemer & Lake Erie R.R. Co.--Abandonment Exemption--in Erie Cnty., Pa*, No. 1FN1OFN, 2008 WL 3971090 (S.T.B. Aug. 26, 2008) .......... 6, 25, 31, 36


**Statutes**

5 U.S.C. § 706 .......... 26

45 U.S.C. § 701 .......... 10, 39

45 U.S.C. §§ 701-793 .......... 10

45 U.S.C. § 748 .......... 2, 11

49 U.S.C. § 10501(b) .......... 14, 15, 42-44, 47

49 U.S.C. § 10501(b)(2) .......... 16, 42, 46

49 U.S.C. § 10901(a) .......... 37

49 U.S.C. § 10903 .......... 14, 17, 18, 22, 37, 46

49 U.S.C. § 10903(d)(1) .......... 27

Pub. L. No. 93-236, 87 Stat. 985 (1974) .......... 9-10

Pub. L. No. 97-35 .......... 11


**Other Authorities**

Fed. R. Evid. 201(b) .......... 13

## GLOSSARY

| | |
|---|---|
| STB | Surface Transportation Board |
| 3-R Act | Regional Rail Reorganization Act of 1973, Pub. L. No. 93-236, 87 Stat. 985 (1974) (codified as amended at 45 U.S.C. §§ 701-793) |
| 4-R Act | Railroad Revitalization and Regulatory Reform Act of 1976 |
| NERSA | Northeast Rail Service Act of 1981 |
| USRA | United States Railway Association |
| FSP | Final System Plan |
| CONRAIL | Consolidated Rail Corporation |
| SEPTA | Southeastern Pennsylvania Transportation Authority |
| ICC | Interstate Commerce Commission |
| ICCTA | Interstate Commerce Commission Termination Act |

## JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to 28 U.S.C. § 2342(5) and 28 U.S.C. § 2321(a). The Surface Transportation Board entered its decision, constituting a final order in Docket No. FD 36768 on September 24, 2025. The STB acted pursuant to 49 U.S.C. § 10501, *et seq.* Petitioner Reading timely filed its Petition for Review on November 11, 2025, within the 60 days required by 28 U.S.C. § 2344.

## STATUTES AND REGULATIONS

The relevant statutes, regulations, and constitutional provisions appear in Addendum A to this brief.

## ISSUES PRESENTED

1. Whether Surface Transportation Board's ("STB") decision ("Order") in concluding that Conrail's application to abandon its operating easement under Section 308 of the Northeast Rail Service Act of 1981 ("NERSA"), 45 U.S.C. § 748, which the Interstate Commerce Commission ("ICC") approved by issuing a certificate of abandonment in 1983, constituted an abandonment of all the rail interests on the Ninth Street Branch,[1] including Reading's residual interest, was arbitrary, capricious, an abuse of discretion, or contrary to law.

2. Whether the STB's disregard of a previous decision involving the same property, *Scioli Turco, Inc. v. Philadelphia & Reading R.R. Co.*, 2023 WL 7646535 (E.D. Pa. Nov. 14, 2023), that supports the STB's continued jurisdiction over the Ninth Street Branch property, rendered

---

[1] In their pleadings in the underlying matter, Reading and the City refer to the viaduct that formerly supported the Ninth Street Branch, and the viaduct line as the "Viaduct." Reading Reply at 1–2 (J.A.0068-0069); Pet. at 1 (J.A.0003). But the STB granted the City's Petition, holding that "the Ninth Street Branch" had been abandoned. Order at 1 (J.A.0272). For clarity and consistency, Reading therefore refers to the rail line, the underlying property, and the Viaduct that supported the track as the "Ninth Street Branch," unless otherwise noted.

its decision arbitrary, capricious, an abuse of discretion, or contrary to law.

3. Whether the STB erred as a matter of law in concluding that Reading had an obligation to pursue unspecified relief from the ICC or STB between 1983 and 2025 to preserve rights it might have retained, despite longstanding precedent that carriers and noncarriers retain rights and obligations related to a particular line unless and until the STB relieves them of that obligation.

## INTRODUCTION

The City of Philadelphia wants property belonging to Petitioner Reading International. But because the real property supports a rail line, federal law prescribes an exclusive means by which the owner must abandon the property. Reading has not done so, though it remains interested in negotiating a price for the property at which it would abandon its interests. Frustrated, the City devised a plan to avoid paying Reading the market price for its property and instead seize it through condemnation: ask the STB to conclude that the rail interests were already abandoned, ***43 years ago***, by an easement holder. If successful, this maneuver would sidestep the pesky statute governing rail lines and allow the City to take the property on its own.

The STB obliged. Faced with significant political pressure, it disregarded its own precedent and a decision from the Eastern District of Pennsylvania involving the very same property and rights to conclude that a third-party's 1983 abandonment of its easement to conduct freight operations was sufficient to abandon the entirety of Reading's rail and property interests and obligations in the Ninth Street Branch, thereby

removing the Branch from the STB's jurisdiction. The STB's decision cannot stand.

In the Interstate Commerce Commission Act and later the Interstate Commerce Commission Termination Act, Congress established a regulatory framework for railroads that assigned the ICC and then the STB jurisdiction over rail-related interests, unless and until a party formally abandons them. These requirements encompass every aspect of a rail line's property interests and residual obligations; they are not limited solely to active transportation or to rail carriers, as opposed to the parent companies that own the real property. Segregating the bundle of interests comprising a rail line in that way would invite gamesmanship, remove integral participants from STB oversight, and sow confusion over the status of real property tied to rail lines.

Congress created this regulatory scheme to promote and regulate rail interests in the United States. That regulation is not limited solely to rail ***service***. Rather, a rail line within the STB's jurisdiction consists of many rail-related interests, including residual rights and obligations along with property rights with which the rail interests are intertwined.

An operator on a certain portion of a line that abandons its limited right to an easement, for example, does not abandon the full line owner's property and residual interests and obligations tied to the line. *Victor Wheeler, et al.--Petition for Declaratory Order--Rail Line in Erie Cnty., Pa Bessemer & Lake Erie R.R. Co.--Abandonment Exemption--in Erie Cnty., Pa*, No. 1FN1OFN, 2008 WL 3971090, at *5 (S.T.B. Aug. 26, 2008). Even former rail properties, where rail operations no longer occur and where tracks have been removed, remain within the STB's jurisdiction until affirmatively abandoned. *Consol. Rail Corp.-Abandonment Exemption-in Hudson Cnty., N.J. CSX Transp., Inc.-Discontinuance of Serv. Exemption-in Hudson Cnty., N.J. Norfolk S. Ry. Co.-Discontinuance of Serv. Exemption-in Hudson Cnty., N.J.,* No. AB 167 (SUB-1189X), 2022 WL 3595013, at *1-2 (S.T.B. Aug. 18, 2022); *Angeles A. Zorzi, Tr. of the Angeles A. Zorzi Living Tr., & Antonio Aja, Jr. & Virginia D. Aja, Trustees of the Antonio Aja, Jr. Tr. & the Virginia D. Aja Trust Petition for Declaratory Order*, No. FD 36016, 2017 WL 431330, at *1 (S.T.B. Jan. 30, 2017).

The Eastern District of Pennsylvania recognized all of these principles in a 2023 ruling involving the same rail line. *Scioli Turco, Inc.*,

2023 WL 7646535. That case addressed several issues dispositive of the current appeal: the scope of a 1983 abandonment by Conrail, which had an operations easement from Reading; Reading's remaining ownership interests in the Ninth Street Branch; and the STB's jurisdiction over the Branch. The District Court held that Conrail's abandonment was limited to its own operations easement, meaning that Reading, which did not join Conrail's abandonment, still owns its Ninth Street Branch interests, and the STB still has jurisdiction over those interests. *Id.* at *4. The District Court explained that a party could apply for abandonment, but Conrail's abandonment "simply [did] not affect the STB's current jurisdiction over the [Ninth] Street Branch and the rights of its owner, Reading." *Id.*

The STB's decision below upends that holding and the legal structure on which it rests. The STB took an excessively narrow view of the rail-related interests in this case and an excessively broad view of Conrail's abandonment. The STB refused to acknowledge or address evidence that Conrail's limited abandonment under NERSA's expedited proceeding did not abandon Reading's Ninth Street Branch interests. Reading's interests were not before the ICC in Conrail's abandonment of its operations easement, a fact that does not change even if Conrail's

application included misleading—and in fact wrong—information related the ownership of the line (which Conrail inaccurately ascribed to the Southeast Pennsylvania Transit Authority ("SEPTA")).

The STB strained to reach the policy outcome it desired, while ignoring statutory impediments, precedent, and inconvenient legal and factual issues that belie its narrative. In doing so, the STB paved the way for the City of Philadelphia to circumvent proper abandonment procedures and usurp Reading's interests in its rail property. The STB's decision was arbitrary, capricious, and contrary to the law. It cannot stand.

## STATEMENT OF THE CASE

The rail line and property at issue in this case is part of Philadelphia & Reading Railroad Company's ("Reading Railroad," Reading's predecessor) Ninth Street Branch. STB Decision dated Sept. 24, 2025 ("Order") at 1-2 (J.A.0272-0273). The City of Philadelphia desires to own the real property attached to the Ninth Street Branch, which it envisions developing. Reading is willing to sell the property, but Reading and the City have been unable to agree on a price. Nor has the City been willing to employ eminent domain, because that would require

it to pay fair market value. This litigation is the result of the City's attempts at a work-around.

In its efforts to wrest control of the Ninth Street Branch from Reading, the City filed its Petition for a Declaratory Order ("Petition") with the STB, requesting that the STB declare the Ninth Street Branch no longer under the jurisdiction of the STB. That would allow the City to condemn the property, which it cannot do while the property is subject to federal regulation. *City of S. Bend v. Surface Transp. Bd.*, 566 F.3d 1166, 1168 (D.C. Cir. 2009); *Scioli Turco, Inc.*, 2023 WL 7646535, at *3–4. The City's theory rests on a third party's abandonment application from over 40 years ago. Pet. at 1 (J.A.0003). At that time, Consolidated Rail Corporation ("Conrail") applied to abandon its use rights under a different regulatory scheme, discussed *infra*. That abandonment never purported to affect Reading's rights in the underlying property.

## I. Factual Background

Reading Railroad owned, operated, and utilized tracks on the Ninth Street Branch for years. Reading Reply at 3 (J.A.0070). In response to the financial collapse of railroads in the Northeast and Midwest in the early 1970s, Congress enacted the Regional Rail Reorganization Act of

1973 ("3-R Act"), Pub. L. No. 93-236, 87 Stat. 985 (1974) (codified as amended at 45 U.S.C. §§ 701-793), which established the United States Railway Association ("USRA") to carry out the reorganization of these railroads. One of the resulting railroads was Reading. 45 U.S.C. § 701; Order at n.4 (J.A.0273). In 1976, Congress passed the Revitalization and Regulatory Reform Act, 45 U.S.C. § 701 *et seq.* ("4-R Act"), in part, to salvage freight operations from failing rail lines. Reading Reply at 4 (J.A.0071). Congress created Conrail to continue operations of certain rail assets. Order at n.4 (J.A.0273).

Congress tasked the USRA to develop a Final System Plan ("FSP") to outline which operations and lines Conrail would operate. Reading Reply at 4 (J.A.0071). In approximately 1976, Reading Railroad transferred certain ***operational*** rights related to freight to Conrail. Reading Reply at 3 (J.A.0070). Reading, however, retained residual rail and property interests in the Ninth Street Branch. Reading Reply at 3 (J.A.0070); Declaration of Anthony DiArenzo ("DiArenzo Decl.") at ¶ 15 (J.A.0093-0094).

Conrail began to experience financial struggles, and in the early 1980s, Congress amended the 3-R Act to address them. Congress passed

the Northeast Rail Service Act of 1981, Pub. L. No. 97-35 ("NERSA"), 45 U.S.C. § 748, to provide an expedited path for Conrail to abandon some of its rail interests. Order at 10 (J.A.0281). An abandonment under this expedited procedure required only that Conrail provide a Notice of Insufficient Revenue, after which the Interstate Commerce Commission ("ICC") (the STB's predecessor) granted abandonment unless an offer of financial assistance was filed. Order at 10 (J.A.0281); 45 U.S.C. § 748.

In March 1983, Conrail applied to the ICC under NERSA § 308 (45 U.S.C. § 748) to abandon its freight operations of the Ninth Street Branch. Conrail's Application for Abandonment ("Application") (Pet., Ex. A) at 1-2 (J.A.0021-0022). Contrary to the STB's suggestion (Order at 10-11 (J.A.0281-0282)), Conrail did not file an application to abandon the entirety of the rail interests on the Ninth Street Branch. Nor could it have; it possessed only an operational easement. Rather, Conrail applied to abandon "its ***operation*** of the lines of rail" on certain portions of the Ninth Street Branch. Application at 1-2 (J.A.0021-0022) (emphasis added).

Conrail's Application wrongly stated that the "described lines are owned by Southeastern Pennsylvania Transportation Authority

("SEPTA") . . . ." Application at 2 (J.A.0022). But Conrail confirmed that, because it did not own the line, its "abandonment relate[d] only to Conrail's operation of the lines." Application at 2 (J.A.0022). Conrail also admitted that "[b]ecause the lines [were] not owned by Conrail and because they generate[d] no revenues or expenses, Conrail ha[d] not computed an estimate of the subsidy that would be required to keep the lines in operation . . . ." *Id.* Conrail served SEPTA with a copy of the Application, apparently based on its misperception of who owned the line; it did not serve Reading. Conrail Letter dated March 10, 1983 (Ex. A to Pet.) at 2-4 (J.A.0017-0019).

The ICC issued an order authorizing abandonment on June 24, 1983. Order at 11 (J.A.0282); Pet., Ex. B (ICC Certificate and Decision ("ICC Certificate")) (J.A.0028-0029). Conrail "implemented" the abandonment on April 23, 1984. Pet., Ex. C (J.A.0034).

Conrail's abandonment of its freight operations did not end activity on the line. SEPTA maintained operations, including an easement in a traction power substation and overhead transmission wires along the line until 2010, when it notified Reading that it was relinquishing the easement. Pet., Ex. D (*Scioli Turco* opinion), at 2, 6 (J.A. 0037, J.A.0041);

Letter to Reading dated July 26, 2010 (ECF No. 16-5, in *Scioli Turco*, Case 2:21-cv-00563-RBS).[2]

Although Reading has not sought to reactivate rail service by contracting with a carrier, the Ninth Street Branch remains physically capable of supporting rail infrastructure subject to technical studies, despite a portion of it being demolished to permit construction of a convention center. DiArenzo Decl. ¶¶ 9-15 (J.A.0091-0094); Pet. at 3 (J.A.0005). The property was also capable of being utilized and developed under the Rails to Trails program, provided it was still under the STB's jurisdiction. Reading Reply at 15-16 (J.A.0082-0083). That a park was built on a segment of the former City Branch Line (Pet. at 3 (J.A.0005)), does not mean that the Ninth Street Branch could never support rail in the future. DiArenzo Decl. ¶ 15 (J.A.0093-0094).

At all times, Reading was the owner of the underlying fee and retained residual interests in the Ninth Street Branch. Reading Reply 3, 5-6, 9-12 (J.A.0070, J.A.0072-0073, J.A.0076-0079). The record is clear

---

[2] Reading requests that the Court take judicial notice of this public filing in a related case. Fed. R. Evid. 201(b); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 303 (D.C. Cir. 2023); *United States v. Gorham*, 536 F.2d 410, 414–15, n.4 (D.C. Cir. 1976); *Booth v. Fletcher*, 101 F.2d 676, 678 (D.C. Cir. 1938).

that Reading never sought abandonment authority for the Ninth Street Branch. Reading Reply 1-2, 6–7, 10, 12 (J.A.0068-0069, J.A.0073-0074, J.A.0077, J.A.0079). Moreover, the City's actions are consistent with Reading's continued ownership and residual interests in the Ninth Street Branch in that it has looked to Reading for development opportunities and financial contribution, including fines related to the upkeep of the property. Reading Reply to the City's Mot. to Strike ("Reply to Mot. to Strike") at 2 (J.A.0262).

The City's circumvention of the abandonment requirements under 49 U.S.C. § 10903 is not the first time someone tried to usurp Reading's residual interests. In 2023, an economic development organization and a neighbor of the Ninth Street Branch previously filed an action against Reading under state law seeking to have the development organization appointed conservator of the property to develop it. Pet., Ex. D at 2 (J.A.0037).

Reading removed the case to federal court, arguing the state action was preempted under 49 U.S.C. § 10501(b), which provides that the STB has "exclusive" jurisdiction over (1) transportation by rail carriers, and (2) the operation, abandonment, or discontinuance of "spur, industrial,

team, stitching, or side tracks, or facilities." 49 U.S.C. § 10501(b). Pet., Ex. D at 4 (J.A.0039). That case, *Scioli Turco*, held that the plaintiff's action was preempted precisely because no party had ever abandoned Reading's interest in the property, which was "part of a rail line" and therefore subject to the STB's exclusive jurisdiction. Pet., Ex. D at 6-7 (J.A.0041-0042).

*Scioli Turco* also presented some of the same issues that the STB decided differently here, including: (1) whether Conrail's abandonment served to abandon Reading's interest in the Ninth Street Branch, (2) whether Reading's noncarrier status and nonuse of the property were dispositive, (3) the effect of SEPTA's operation on the Ninth Street Branch as indicative of remaining rail interests after 1983, and (4) the STB's continuing jurisdiction over the Ninth Street Branch as a matter of federal law.

The Eastern District of Pennsylvania decided each of these issues. First, it held that Conrail's application under NERSA related only to "Conrail's ***operation*** of" the Ninth Street Branch. Pet., Ex. D at 10 (J.A.0045) (emphasis added). Second, it concluded that, because the action related to the abandonment of part of a rail line covered by 49

U.S.C. § 10501(b), the District Court did not need to engage in a factual assessment of whether the property had not been used for rail for years. Pet., Ex. D at 6-7 (J.A.0041-0042). It also did not matter that Reading was not currently a rail carrier because Section 10501(b)(2) provides for the STB's exclusive jurisdiction over abandonment of facilities as well. Pet., Ex. D at 7-8 (J.A.0042-0043). Third, the fact that a local governmental authority not under the STB's jurisdiction, SEPTA, continued operation on the line after Conrail's abandonment of its easement had no effect on the STB's continued jurisdiction over the Ninth Street Branch because Reading, not SEPTA, owned the line. Pet., Ex. D at 10-11 (J.A.0045-0046). Fourth, the District Court concluded that Conrail's abandonment "simply does not affect the STB's current jurisdiction over the 9th Street Branch and the rights of its owner, Reading." Pet., Ex. D at 10 (J.A.0045). The District Court made these findings and conclusions based on its interpretation of the statutes at issue and the evidence in the record, including the deed conveying the operating easement to Conrail and correspondence from SEPTA to Reading, wherein SEPTA relinquished its easement back to Reading.

Reading Opp. and Mot. to Strike City's Mot. for Leave to File Reply at 6 (J.A.0193).

## II. Procedural History

In April 2024, the City filed a Petition with the STB, seeking to circumvent the abandonment requirements of 49 U.S.C. § 10903 to obtain ownership of the Ninth Street Branch. Pet. at 1-2 (J.A.0003-0004); Reading Reply at 1-2 (J.A.0068-0069). Specifically, the City sought a declaration that: (1) the right to operate a railroad line "was and remain[ed] abandoned" pursuant to Conrail's 1983 Application; (2) the STB had no remaining jurisdiction over the ownership, control, or use of the Ninth Street Branch because the line was abandoned, tracks had been removed and portions of the Viaduct had been demolished; and (3) Reading, "the owner" of the Ninth Street Branch could not "claim a right to use the Viaduct for railroad purposes because it [was] not and never ha[d] been a rail carrier and possesse[d] no authority to operate a rail line." Pet. at 1 (J.A.0003); Reply at 2 (J.A.0069).

Reading opposed the Petition, arguing that the STB's jurisdiction persisted because it had never abandoned and still retained its residual rail and property rights. Reply 1-3, 5-10 (J.A.0068-0070, J.A.0072-0077).

Reading also emphasized that *Scioli Turco* had already applied the same statutes at issue, sections 10501 and 10903, to the same facts and concluded that Conrail's 1983 abandonment of its operations easement did not serve to abandon Reading's ownership interests in the Ninth Street Branch. The District Court thus concluded the STB continued to maintain jurisdiction until a party applied for abandonment pursuant to 49 U.S.C. § 10903. Reply at 11-14 (J.A.0078-0081).

The proceeding before the STB also piqued the interest of politicians. Philadelphia Councilmember Mark F. Squilla submitted a letter supporting the City's position in May 2024. U.S. Representative Brendan Boyle and U.S. Senator John Fetterman also submitted letters of support in December 2024. Senator Fetterman's letter tellingly noted the "significant land use implications" in the case. Order at 4 (J.A.0275).

The STB, in a decision dated September 24, 2025, granted the City's Petition. Disregarding its own precedent and the *Scioli Turco* decision as well as evidence before the agency, the STB held that Conrail's 1983 NERSA abandonment also abandoned Reading's ownership rights and, as a result, the STB no longer had jurisdiction over the property. Order at 1 (J.A.0272). The STB also offered an advisory opinion that federal

preemption under ICCTA would not prevent condemnation of the property under state law, even though the City did not request a declaration that ICCTA would not preempt a condemnation proceeding. Order at 1 (J.A.0272); Pet. at 1, 10-11 (J.A.0003, J.A.0012-J.A.0013).

The City is now in the process of condemning and taking Reading's property. Mot. to Intervene (Doc. No. 2150513).

This appeal followed.

## SUMMARY OF THE ARGUMENT

Reading appeals the STB's decision that effectively removed Reading's Ninth Street Branch from the STB's jurisdiction, allowing the City to proceed to take this valuable property to the detriment of the property's owner—Reading. The STB's decision is arbitrary, capricious, and contrary to law.

First, the STB misconstrued the legal scope and effect of Conrail's 1983 abandonment, which was necessarily limited to the rights Conrail possessed, namely its operational easement but ***not*** Reading's separate property and residual interests and common carrier obligations. Conrail could not abandon what it did not possess. The STB misapplied statutory and regulatory law, failed to account for established precedent, and ignored critical factual distinctions between abandonment of operating rights and abandonment of all rail-related interests.

Second, the STB failed to explain why the *Scioli Turco* decision, which involved the very same property and the very same issues, does not control. Agencies are not free to ignore the decisions of Article III courts on questions of federal law, yet that is precisely what the STB did in reaching contrary conclusions on each issue presented in this case.

Third, the STB's decision relies on an unwritten and undisclosed obligation on Reading to approach the STB sometime between 1983 and 2025 to seek unspecified relief to preserve Reading's existing rights in the Ninth Street Branch. No law imposes such an obligation. In addition to making a mockery of due process, the STB's post hoc rule offends the APA rulemaking procedures and inverts the process Congress established, which requires a party in Reading's position to take action to ***abandon*** its property, not to preserve it. The STB's reliance on an undisclosed requirement for Reading to keep what it owns moves this case from error to scandal. Episodes like this are why Americans are fearful of the administrative state. The Court should restore the rule of law in no uncertain terms.

The Court should vacate the STB's decision that it no longer has jurisdiction over the Ninth Street Branch and prevent an unlawful condemnation action from proceeding. Neither the City nor the STB is above the law, regardless of how sincerely they desire to remake Reading's property as a park or jogging trail.

## STANDING

Petitioner Reading International, Inc. has standing because it has been injured in fact by the STB's Decision dated September 24, 2025; the injury is traceable to that action; and the injury would be redressed by a favorable ruling from this Court.

Reading owns the rail line and property at issue in this case. Reply at 1 (J.A.0068). The STB's Decision that it no longer has jurisdiction over the property was a necessary condition for the City to institute condemnation proceedings against Reading to obtain the property without paying fair value. The STB's Decision impacts Reading's future use of the property.

## ARGUMENT

### I. The STB's Decision that Conrail's Abandonment of Its Operating Easement Constituted an Abandonment of Reading's Residual Interests on the Ninth Street Branch Was Arbitrary, Capricious, and Contrary to Law.

In 1983, Conrail abandoned its easement pursuant to Section 308 of NERSA. As a matter of law, that abandonment could not abandon Reading's interest in the Ninth Street Branch. And Reading never abandoned under the exclusive process for doing so in 49 U.S.C. § 10903. The STB therefore acted contrary to law in treating the Conrail

abandonment as accomplishing anything more than it did. Moreover, the STB "acts arbitrarily and capriciously if it 'reverses its position in the face of a precedent it has not persuasively distinguished'" or if it fails to consider all the relevant factors in reaching its decision. *New York Cross Harbor R.R. v. Surface Transp. Bd.*, 374 F.3d 1177, 1181 (D.C. Cir. 2004) (citations and marks omitted). Here, the STB did both. It disregarded its own precedent concerning its jurisdiction and regulatory requirements for abandonments and ignored evidence in the record to conclude that Conrail's abandonment of its freight operations easement also abandoned Reading's residual interests in the Ninth Street Branch.

### A. The STB misconstrued the scope and effect of Conrail's 1983 abandonment.

The STB erred in concluding that Conrail's abandonment of its operating easement extinguished Reading's interests in the Ninth Street Branch, thereby eliminating any remaining federal jurisdiction. That holding offends the APA because Conrail possessed only an operations easement for certain lines on the Ninth Street Branch. Conrail's abandonment did not—and could not—abandon Reading's separate property and rail-related interests (and obligations) in the entire Ninth Street Branch.

Section 308 of NERSA provided an expedited path for abandonment of struggling freight operations in the Northeastern United States. That procedure stands on a foundation of property law principles that determine who possesses which interests (and may therefore alienate those interests). "Congress is understood to legislate against a background of common-law adjudicatory principles." *Astoria Fed. Sav. & Loan Assn. v. Solimino*, 501 U.S. 104, 108 (1991); *Merck Co. v. Reynolds*, 559 U.S. 633, 648 (2010) (assuming congressional awareness of "relevant judicial precedent"). Among those principles is that no one can dispose of a greater property interest than he possesses. *See, e.g., Mitchell v. Hawley*, 83 U.S. 544, 550–51 (1872). In particular, an easement holder may dispose of its easement but may not affect the rights of the underlying property owner. *Preseault v. United States*, 100 F.3d 1525, 1537 (Fed. Cir. 1996) (holding that, upon the termination of a railroad's easements, the property owners have unqualified ownership); *Unit Petroleum Co. v. Veitch*, 79 F. Supp. 3d 1234, 1242–44 (N.D. Okla. 2015) (rejecting abandonment argument when putative new owner did not comply with statutory procedures concerning abandonment and when

the actual owners did not knowingly and voluntarily abandon their interests).

Consistent with the property-law background, when Conrail availed itself of the NERSA abandonment procedure, its Application was limited to "the abandonment of [Conrail's] operation of the lines of rail." Application at 1-2 (J.A.0021-0022). In fact, Conrail made clear that its "proposed abandonment relate[d] only to Conrail's operation" and acknowledged that it did not own the lines. Application at 2 (J.A.0022). This is because Reading had a reversionary interest in the rights and obligations related to the easement. *Reading Co. v. City of Philadelphia*, 823 F. Supp. 1218, 1223-24 (E.D. Pa. 1993).

The STB's own findings confirm that Conrail did not own the fee, but only an operating easement. Order at 2, 9 (J.A.0273, J.A.0280). And the STB has previously recognized that abandonment by an easement holder of a limited easement does not, without more, extinguish the underlying fee owner's residual interests or obligations. *Victor Wheeler, et al.*, 2008 WL 3971090, at *5.

Breaking with that straightforward construction of NERSA, the STB in this case summarily decided that Reading Railroad "ceased being

a federally-regulated rail carrier once its regulatory obligation to provide rail service was transferred to Conrail pursuant to the FSP," without citing any evidence that the transfer to Conrail was permanent (none exists) or any legal authority for why a temporary operating easement would extinguish Reading's residual interests and obligations. Order at 9 (J.A.0280). The STB then relied solely on Reading's alleged noncarrier status to conclude that Conrail's limited abandonment encompassed all of the rail-related interests and obligations on the Ninth Street Branch. Order at 11-13 (J.A.0282-0284). Again, this is a *non sequitur* when Conrail never possessed those interests.

Treating Conrail's abandonment as encompassing more than it expressly stated is arbitrary and capricious, an abuse of discretion, and not in accord with law. In particular, ignoring the statutory requirements for abandonment and a legal instrument's plain terms is impermissible. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 406–07 (2025) (noting courts' obligation to decide "all relevant questions of law" under 5 U.S.C. § 706). There is simply no legal basis for STB to reach back four decades and recast Conrail's abandonment as relinquishing more than Conrail owned. The Court can reverse on this basis alone.

### B. Reading's remaining interest in the Ninth Street Branch falls under the STB's jurisdiction.

The text of the abandonment statute itself indicates that many interests can comprise a rail line, each of which requires abandonment to remove it from the STB's jurisdiction. *R.R. Ventures, Inc. v. Surface Transp. Bd.*, 299 F.3d 523, 531 (6th Cir. 2002) ("A line owner may 'abandon ***any*** *part* of its railroad lines,' 49 U.S.C. § 10903(d)(1), but cannot do so without the permission of the STB.") (emphasis added); *Matter of Boston & Maine Corp.*, 596 F.2d 2, 5–6 (1st Cir. 1979) (explaining that a rail line is not limited to the service operating on that line but also includes physical properties).

Applying this concept, the STB asserted jurisdiction over a noncarrier owner in *City of Austin, Texas—Acquisition—Southern Pacific Transportation Co.,* F.D. No. 30861(A), 1986 WL 1166762 (ICC Nov. 4, 1986). There, the ICC required the City of Austin to obtain agency authorization to acquire a line because doing so would "assum[e] a common carrier obligation (even though it did not intend to operate the line itself)," which it could discharge by "contracting with, and ensuring continued service by, a rail operator." *Id.* Although the line in *City of Austin* was still operating, that precedent confirms that when a party—

even a noncarrier—has "full ownership" of a line, the assumption of a residual common carrier obligation requires abandonment to remove it from the regulatory system.

Finally and perhaps most importantly, the STB has historically recognized the bundle of rights comprising a rail line and required specific abandonment of each. *See Beaufort R.R. Co., Inc.--Modified Rail Certificate*, No. F.D. No. 34943, 2009 WL 2170143, at *5 (S.T.B. July 20, 2009). In *Beaufort*, the STB rejected the argument that a rail line had been abandoned when the operator had terminated its services, after which no rail service occurred on the line. *Id.* at *3. The STB confirmed that a termination by the operator was not sufficient to show an intent to abandon by the line owner, explaining:

> [A] notice of termination by the modified certificate *operator* was not enough to show an intent to abandon by the line owner. . . . It would be at odds with the Board's long-standing policy for the Board to have concluded that a state [*i.e.,* the line owner] would automatically lose its property and the public would lose the opportunity for future rail service (as well as the public investment of funds in the property) merely because the state's arrangement with a particular operator ends and the state did not engage a replacement operator immediately or within a short period of time.

*Id.* at *5 (emphasis in original). The STB's conclusion in this case that Conrail ceasing its operations and its limited abandonment would cause

Reading to automatically lose its rail property rights is irreconcilable with *Beaufort* and the precedent on which it relied.

In sum, the STB failed to sufficiently acknowledge or address its precedent that demonstrates rail lines may be comprised of many different rights, each of which requires abandonment to remove the STB's jurisdiction.

### C. The STB erred by failing to explain why Reading's interests do not qualify as a rail line under the STB's jurisdiction.

The STB also failed to adequately explain why Reading's residual and retained interests in the Ninth Street Branch would not themselves qualify as interest in a rail line to keep the interest under the STB's jurisdiction. Recall that Reading owns everything except Conrail's non-exclusive operating easement, which it abandoned 43 years ago. But subtracting that easement leaves a full ownership interest in the rail line. A different conclusion might follow if Conrail had abandoned an exclusive right to operate on the Ninth Street Branch, but abandoning a non-exclusive easement does not impair Reading's rights at all.

The APA requires an agency to "articulate the reasoning behind its decision with sufficient clarity to enable petitioners and this court to understand the basis for its decision." *Snohomish Cnty., Washington v.*

*Surface Transp. Bd.*, 954 F.3d 290, 301 (D.C. Cir. 2020) (citation omitted); *see also Riffin v. Surface Transp. Bd.*, 592 F.3d 195, 196-98 (D.C. Cir. 2010) ("Because the STB failed adequately to explain its decision, as required by the Administrative Procedure Act, we grant Riffin's petition for review and remand this matter to the agency for further proceedings."). Part of the explanation required in the context of eschewing jurisdiction is why Reading's interests do not constitute a rail line.

The STB pointed out that a "railroad line" encompassed "the regulatory right and obligation to operate as a common carrier and the property right needed to provide freight rail service," which was "not coterminous with the underlying real property and physical rail assets." Order at 7-8 (J.A.0278-J.A.0279). The STB's definition of a railroad line referred "collectively to the common carrier obligation and the property rights used to effectuate that obligation." Order at 8 (J.A.0279). But the STB did not explain why the Ninth Street Branch comprised of Reading's residual carrier interest and obligations along with its real property interests could not constitute a rail line within the STB's jurisdiction. *New York Cross Harbor R.R.*, 374 F.3d at 1183 ("The Board's brief,

generalized statement fails to provide an 'adequate explanation' to allow the STB to ignore factors and reasoning it has previously – and consistently – found controlling.") (citations omitted).

The flaw in the STB's unexplained conclusion appears to be its overreading of Conrail's 1983 abandonment. But, as already noted, Conrail possessed only an easement for freight operations. In these circumstances, the owner of the full line—Reading—retains a common carrier obligation, should rail operations need to resume at some point in the future. *Victor Wheeler, et al.*, 2008 WL 3971090, at *5; *Midwest Generation, LLC-Exemption from 49 U.S.C. 10901-for Constr. in Will Cnty., Il Midwest Generation, LLC-Petition for Line Crossing Auth. Under 49 U.S.C. 10901(d)*, No. 34060, 2002 WL 437218, at *1 (S.T.B. Mar. 20, 2002), modified, Fed. Carr. Cas. (CCH) ¶ 37107 (S.T.B. Oct. 3, 2002). That remains true even if capital improvements would be needed to connect the Ninth Street Branch to a broader rail network. The fact remains that Reading owns a complete interest in a rail line, which falls within the STB's jurisdiction. Conflating Conrail's abandonment of its easement with an abandonment of all interests in the Ninth Street Branch is contrary to the regulatory scheme and STB precedent.

Rejecting jurisdiction on that basis is therefore impermissible under the APA.

### D. The STB failed to recognize Reading's residual and retained interests, disregarding substantial evidence in the record.

The STB's decision fails to address evidence in the record indicating that operations continued on the Ninth Street Branch after Conrail's limited abandonment and that Reading has an ownership interest in the Ninth Street Branch sufficient to maintain STB jurisdiction.

#### 1. Operations continued on the Ninth Street Branch after Conrail's limited abandonment.

The STB erred in failing to sufficiently address continued rail operations on the Ninth Street Branch after Conrail's abandonment. The record shows that SEPTA continued operations on the line until 2010 when it relinquished its easement to Reading. Pet., Ex. D at 2, 6 (J.A.0037, J.A.0041). The STB dismisses those operations as irrelevant because commuter service provided by SEPTA was not subject to the STB's regulatory jurisdiction. Order at 11 (J.A.0282). That misses the point. No one argues that the STB regulates commuter service; the point is that rail operations continued and operating rights remained on the Ninth Street Branch for nearly three decades after Conrail's abandonment of its easement. That would not have been possible if

Reading did not have rights to assign to SEPTA. Similarly, the evidence also demonstrates that SEPTA ultimately relinquished its easement to Reading, which again confirms that Reading has always retained ownership of the line. The STB summarily dismisses these continued operations—which assume Reading's ownership—without explanation. Order at n.20 (J.A.0282).

Incidentally, none of this is news to the City. Reading has successfully litigated environmental issues against the City and SEPTA in connection with operations on the line before ***and after*** Conrail abandoned its easement. In those proceedings, the court acknowledged Reading's continued ownership. *Reading Co.*, 823 F. Supp. at 1223-24, 1227. At that time, the City did not contest that rail operations continued long after 1983. Only now, driven by development ambitions and a desire to pay as little as possible, does the City pivot to a new position.

**2. The STB ignored evidence in the record that Reading retained residual and common carrier interests and obligations.**

The STB repeatedly and incorrectly suggests Reading did not contest that it gave up and forever lost its common carrier status. Order at 6, 8-9, 11 (J.A.0277, J.A.0279-0280, J.A.0282). That is wrong. Reading

asserted not only property interests but also its pre-existing residual and retained interests in the Ninth Street Branch, including its ownership of the "line" that the STB ignored. Reply at 2, 5, 7 (J.A.0069, J.A.0072, J.A.0074).

Reading submitted evidence in the form of a declaration by Anthony DiArenzo, who worked as a railroad employee for over 40 years, first with Penn Central Transportation Company for two years and then with Conrail from 1976 through 2017. DiArenzo Decl. at ¶ 2 (J.A.0089). In his roles with Conrail, Mr. DiArenzo focused on rail operations, rail transport, property management, site selection, and rail-related real estate issues. DiArenzo Decl. at ¶ 2 (J.A.0089). Mr. DiArenzo explained that Reading owned not only property interests in the Ninth Street Branch but also residual interests and retained parcels over which the STB retains jurisdiction. DiArenzo Decl. at ¶¶ 10-15 (J.A.0092-0094).

The STB did not acknowledge much less address Mr. DiArenzo's declaration. That is a textbook failure to engage with a significant aspect of the case. *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (noting the agency must explain the evidence which is available, and must offer a

"rational connection between the facts found and the choice made.") (citation omitted). The STB cannot rewrite history to declare something uncontested by simply ignoring the contest.

The STB also summarily dismissed Reading's assertion that it maintained rail interests and common carrier obligations after Conrail abandoned its non-exclusive freight interest. Reply to Mot. to Strike at n.4, 4 (J.A.0263-0264). As Reading explained, "rail interests and common carrier obligations can remain" after other interests in a rail line are abandoned. Reply to Mot. to Strike at n.4 (J.A.0263-0264). That is not only Reading's position, but for four decades, it has been the STB's view as well. *See, e.g., Midwest Generation, LLC*, 2002 WL 437218, at *1 (finding Midwest had a residual common carrier interest even though it was not a rail carrier and would not be performing rail operations on a rail line); *Massachusetts Dep't of Transportation Acquisition Exemption of certain Assets of CSX Transp., Inc.*, No. F.D. 35312, 2009 WL 6408804, at *8 (S.T.B. May 3, 2009) (discussing *Bhd. of Locomotive Engineers, et al. v. Staten Island Rapid Transit Operating Auth.*, 360 I.C.C. 464, 472–73 (I.C.C. 1979), *aff'd sub nom. Staten Island Rapid Transit Operating Auth. v. I.C.C.*, 718 F.2d 533 (2d Cir. 1983), in which a city had filed an

application to take over and operate the freight services on a line, and the ICC found the owner, MTA, held a residual common carrier obligation, which would apply if the freight carrier the city hired failed to perform). The STB gives no reason to change its approach now.

For example, the STB previously rejected the contention that Penn Central abandoned a line belonging to another company (E&P) simply by abandoning service on that line. *Victor Wheeler, et al.*, 2008 WL 3971090, at *5. Discontinuing service, the STB explained in that case, did not affect E&P's rights in the least: "the tracks and right-of-way over which Penn Central operated were owned by the E&P, and E&P's interests were not before the ICC in the proceeding in which the Penn Central was authorized to discontinue its operations over the line." *Id.* Thus, "[a]s owner and lessor, E&P continued to hold a residual common carrier obligation" and "the line remained subject to our jurisdiction because E&P had not obtained abandonment authority." *Id.* Likewise here, Conrail abandoned only its freight operations easement, not Reading's residual interests and obligations, which were not before the ICC during Conrail's expedited abandonment proceeding.

Furthermore, it is of no moment that tracks or railroad equipment have been removed and structures have built on certain parts of the Ninth Street Branch. The question under federal law is whether rail could operate on the property in the future. *United Transp. Union-Illinois Legislative Bd. v. I.C.C.*, 52 F.3d 1074, 1078 (D.C. Cir. 1995) ("rail carrier" under 49 U.S.C. § 10901(a) "includes rail carriers-to-be"). A rail line—even one that does not have tracks, a station, rail, etc. but could conceivably support rail service in the future—is not "abandoned" under 49 U.S.C. § 10903 until the STB pronounces it so. *See, e.g., Trustees of Diocese of Vermont v. State*, 145 Vt. 510, 496 A.2d 151 (1985) (affirming dismissal of an action based on a lack of jurisdiction because the ICC had not authorized abandonment of a route where ***all*** railroad equipment (including switches, bridges, and track) had been removed), *aff'd sub nom Preseault v. I.C.C.*, 494 U.S. 1, 9–10 (1990); *Joseph R. Fox—Petition for Declaratory Order*, No. FIN 35161, 2009 WL 1383503, at *2 (S.T.B. May 13, 2009), aff'd sub nom. *Fox v. STB*, 379 Fed. Appx. 767 (10th Cir. 2010) (noting abandonment does not occur "without advance authorization from the Board," and therefore removal of equipment did not constitute abandonment); *Consol. Rail Corp.-Abandonment Exemption-in Hudson*

*Cnty.*, 2022 WL 3595013, at *1-2 (abandonment proceedings were required despite the fact that: the property was sold; the property was owned by a non-rail carrier; rail had not operated on the property in decades; "no trace of the rail line remain[ed];" bridges, tracks, and infrastructure had been removed; and development had occurred on portions of the property); *Angeles A. Zorzi, Tr.*, 2017 WL 431330, at *1 (concluding that, despite rail being removed and no activity occurring, the line remained part of the national rail network and under the STB's jurisdiction); *Norfolk & W. Ry. Co.--Abandonment Exemption--Between Kokomo & Rochester in Howard, Miami, & Fulton Ctys., in*, No. AB-290 (SUB 168X), 2005 WL 1030535, at *5-7 (S.T.B. May 3, 2005) (rejecting de facto abandonment argument because the disputed "line remains a link by which the northern segment ***could*** connect to the interstate rail network if active rail service on this rail banked line were to be restored," and noting removal of rails and other materials did not mean that a rail-line segment had been abandoned (emphasis added)).

There is no question that certain portions of the Ninth Street Branch could support rail services in the future. *See, e.g.,* DiArenzo Decl. at ¶ 15 (J.A.0093-0094). STB did not dispute that fact. Its decision relied

instead on a legal error regarding the effect of degraded rail equipment. That has never been the STB's policy, and pivoting to such a rule would require reasoned decision making, which has not occurred. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change," "'display awareness that [they are] changing position,'" and account for "'serious reliance interests.'" (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). Under existing law, Reading retains a residual interest in its rail line even if operations have ceased and capital has degraded or disappeared—and a corresponding obligation to act as a common carrier if/when service resumes. As a result, the STB cannot eschew jurisdiction without going through the statutory process.

* * *

The STB erred in accepting the City's long-shot argument that Conrail's decades-old abandonment of its operational easement on the Ninth Street Branch terminated Reading's rights and obligations as the owner of a rail line. The facts and law belie that theory. An easement holder cannot disclaim the ownership rights of the party that owns the

underlying fee, especially when federal law sets forth a specific process for abandoning that property. In the 3-R Act, 4-R Act, and NERSA, Congress created a strict process, which it hoped would protect rail operations in the Northeast. The STB's casual approach to abandonment here—executed with 43 years of hindsight and at the behest of a salivating municipality—is the opposite of what Congress intended and upends settled law and precedent.

## II. The STB's Disregard of Relevant District Court Authority Rendered Its Decision Arbitrary, Capricious, and Contrary to Law.

The STB summarily disregarded the Eastern District of Pennsylvania's decision in *Scioli Turco* and failed to provide a reasoned basis for its contradictory decision.

### A. The *Scioli Turco* decision is directly on point.

In *Scioli Turco*, the United States District Court for the Eastern District of Pennsylvania concluded that Conrail's abandonment was limited to solely Conrail's operating easement, Reading retained ownership interests in the Ninth Street Branch sufficient to keep the property within the STB's jurisdiction, and the plaintiff's action to take control of the property was preempted. 2023 WL 7646535, at *1-4. The court emphasized that "Conrail's abandonment simply does not affect the

STB's current jurisdiction over the 9th Street Branch and the rights of its owner, Reading." *Id.* at *4. No appeal was taken.

### B. The STB failed to distinguish or explain its departure from this authority, which was arbitrary and capricious.

The STB's failure to meaningfully engage with the *Scioli Turco* decision (Order at 7 (J.A.0278)) is itself arbitrary, capricious, and most certainly contrary to law.

The Framers of the Constitution "envisioned that the final 'interpretation of the laws' would be 'the proper and peculiar province of the courts.'" *Loper Bright Enterprises*, 603 U.S. at 384–85 (citation omitted). Consistent with the separation of powers, "[j]udicial precedent is as binding on administrative agencies as are statutes." *Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1375 (Fed. Cir. 2009) (citation omitted). Where a court has interpreted statutes, those decisions comprise the "law as it exists at the time of" an agency's review of an issue. *Coniglio v. Garland*, 556 F. Supp. 3d 187, 204 (E.D.N.Y. 2021).

*Scioli Turco* establishes the law in the Eastern District of Pennsylvania, where the property in question is located. It also disposes of every issue in the current case—what interest Conrail abandoned, Reading's remaining interests, and the STB's jurisdiction. When

carrying out "the administration and enforcement of a federal statute within this district," the STB "is bound to pay due respect to the decisions of [the district court]." *Flores v. Sec'y of Health, Educ. & Welfare*, 228 F. Supp. 877, 877–78 (D.P.R. 1964). The importance of agency deference to judicial precedent is all the more forceful after the Supreme Court's decision in *Loper Bright*, which removed agencies' only argument for construing a statute and asking the courts to defer, rather than the other way around.

Even if it was not binding, the *Scioli Turco* decision is correct and required, at minimum, a response from the STB. *Scioli Turco* rejected an argument similar to the City's that 49 U.S.C. § 10501(b) did not apply to plaintiffs' action and the STB did not have jurisdiction over the property because Reading was not a railroad and the property had not been used for rail operations since the mid-1980s. *See* 2023 WL 7646535, at *3. The court's reasoning bears repetition:

> First, while Section 10501(b)(1) provides the STB with exclusive jurisdiction over "transportation *by rail carriers*" (emphasis added), Section 10501(b)(2) simply provides the STB exclusive jurisdiction over "the ... abandonment ... of ... facilities," but does not mention "rail carriers." 49 U.S.C. § 10501(b). Accordingly, the ICCTA does not on its face restrict the STB's jurisdiction, and therefore the scope [] of the preemption provision, to the abandonment of rail facilities by

> *rail carriers.* Second, it is well established that someone other than a rail carrier may apply to the STB to have a rail line declared abandoned. *See Howard v. Surface Transp. Bd.*, 389 F.3d 259, 261 (1st Cir. 2004) (citing *Consolidated Rail Corp. v. I.C.C.*, 29 F.3d 706, 708–09 (D.C. Cir. 1994)). Therefore, an abandonment remedy is available to Reading (and to Plaintiffs), and Section 10501(b) still preempts Plaintiffs' Act 135 action.

*Id.* (emphases in original). This passage also contains a remedy for the City's grievance. Based on this Court's decision in *Howard*, the Eastern District of Pennsylvania advised the *Scioli Turco* plaintiffs of their ability to petition for abandonment. The same is true for the City. It could go through the statutory process for abandonment, but it has chosen not to—just as it has chosen not to pay Reading the market price for the Ninth Street Branch. Like the plaintiffs in *Scioli Turco*, the City's preference for a shortcut does not undermine the plain meaning of the statute.

That meaning is not novel. *Scioli Turco* is consistent with prior STB decisions holding that abandonment must occur through statutory procedures. *See, e.g., Pinelawn Cemetery Petition for Declaratory Order*, No. FD 35468, 2015 WL 1813674, at *1–10 (S.T.B. Apr. 20, 2015) (denying petition for declaratory order, finding in part the property still within the jurisdiction of the STB even though it was used by a party who

was not a rail carrier); *Fox v. Surface Transp. Bd.*, 379 Fed. Appx. 767, 770 (10th Cir. 2010) (noting "the Board has exclusive jurisdiction over 'the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities.'").

As the STB itself has stated, "issues involving federal preemption under 49 U.S.C. § 10501(b) can be decided either by the Board or the courts in the first instance." *Tesoro Ref. & Mktg. Co., LLC Petition for Declaratory Order*, No. FD 36041, 2016 WL 6809953, at *4 (S.T.B. Nov. 14, 2016). In *Tesoro*, for example, the STB denied Tesoro's petition for a declaratory order that "the Swinomish Tribe's claims against BNSF [were] largely preempted by § 10501(b)" because a district court had already decided the issue. *Id.* at *5. The STB noted that BNSF made the argument before the district court, and even though Tesoro was not a party to that proceeding, the STB followed the court's holding on preemption. *Id.*

Here, the *Scioli Turco* court interpreted the relevant statutes at issue and confronted almost identical facts, constituting an important aspect that the STB did not consider. And although not its own

precedent, the STB wholly failed to "come to grips with conflicting precedent" arising out of the district court in the same district as the subject rail property, thus constituting "an inexcusable departure from the essential requirement of reasoned decision making." *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1120 (D.C. Cir. 2010). "Silence in the face of inconvenient precedent is not acceptable." *Id.*

The STB erred by refusing to follow *Scioli Turco*, which correctly decided that Conrail only abandoned its operating interest—not the entirety of Reading's interests, meaning that the latter remained within the STB's jurisdiction. At the very least, the requirement of reasoned decision making obliges STB to address a court's antipodal construction of the governing statutes.

## III. The STB's Decision Would Require Reading to Petition for Relief to Preserve Residual Rights When There Is No Such Requirement Under the Law.

Throughout its decision, the STB suggests that Reading had a duty to take affirmative action to keep the Ninth Street Branch within the jurisdiction of the STB. Neither party in the underlying proceeding raised the argument that Reading had such an affirmative duty, and no such requirement exists as a matter of law.

The STB's jurisdiction over "the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities . . . is exclusive." 49 U.S.C. § 10501(b)(2). The STB's jurisdiction is not limited to transportation by a rail carrier, as the *Scioli Turco* court explained. *Scioli Turco, Inc.*, 2023 WL 7646535, at *2-3.

Before a rail interest can be "abandoned," a party must satisfy certain requirements, after which the STB issues a decision granting the abandonment. 49 U.S.C. § 10903. The process requires strict notice and other procedural requirements. *Id.* As this Court has held, a property must be abandoned through the proper procedures to remove it from the STB's jurisdiction. *Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.*, 158 F.3d 135, 137 (D.C. Cir. 1998).

Conversely, neither the statute nor the implementing regulations require affirmative action to prevent a party's residual rights and obligations from disappearing at an unspecified time over the course of the party's ownership. A rail property like the Ninth Street Branch does not suddenly become without regulatory oversight because Reading did not hire an operator, for example. *Beaufort*, 2009 WL 2170143, at *5

(explaining that a line owner does not "automatically lose its property" because its agreement with one operator ends and the owner "did not engage a replacement operator immediately or within a short period of time."). Many nonfunctioning rail lines nationwide retain STB jurisdiction until proper abandonment. *See, e.g., Baros v. Tex. Mexican Ry. Co.*, 400 F.3d 228, 229–32 (5th Cir. 2005).

Indeed, the existence of mandatory statutory procedures implies that no alternative means of abandonment are possible, least of all unwritten means of which no one was aware. Inventing new requirements is not only an affront to due process, but it undermines the purpose for which Congress gave the STB exclusive jurisdiction pursuant to 49 U.S.C. § 10501(b). The carefully designed federal statutes are intended to prevent a "patchwork" of local regulation. *CSX Transp., Inc. v. City of Sebree*, 924 F.3d 276, 281 (6th Cir. 2019). The Board's suggestion that rail line owners must comply with unwritten requirements to keep their property introduces a variation on the same uncertainty Congress sought to eradicate. If allowed to stand, the STB's approach would unsettle property rights in unused rail lines across the country. The Court should not allow such lawless and arbitrary action.

## CONCLUSION

The STB "simply accede[d] to a public entity's wishes" by granting the City's demand that it treat a 43-year-old abandonment of a non-exclusive operations easement as abandoning different rights belonging to a different company. *New York Cross Harbor*, 374 F.3d at 1184–85. This Court has rejected that maneuver in the past and insisted on compliance with the procedures Congress adopted. Because Reading has never abandoned its rights in the Ninth Street Branch, that line remains subject to STB's exclusive jurisdiction, and the City's condemnation dreams will have to yield to paying a market price.

Respectfully submitted,

June 22, 2026

Dominic E. Draye
*Counsel of Record*
GREENBERG TRAURIG, LLP
2101 L Street, N.W.
Suite 1000
Washington, DC 20037
(202) 331-3168

John Voorhees
GREENBERG TRAURIG, LLP
1144 15th Street
Suite 3300
Denver, CO 80202
(303) 685-7465

Jennifer Bartlett
GREENBERG TRAURIG, LLP
2200 Ross Avenue
Suite 5200
Dallas, TX 75201
(214) 665-3729

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations in Federal Rule of Appellate Procedure Rule 28.1. It contains 9,156 words, excluding the portions of the brief exempted by Circuit Rule 32(e)(1). Fed. R. App. P. 32(a)(7)(B); D.C. Cir. R. 32(e)(1). It is set in double-spaced, size-14 Century font. Fed. R. App. P. 32(a)(5).

/s/ *Dominic E. Draye* .
Dominic E. Draye

## CERTIFICATE OF SERVICE

Pursuant to Rule 25 of Federal Rules of Appellate Procedure, I hereby certify that on June 22, 2026, I caused to be electronically filed the foregoing with the Clerk of the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ *Dominic E. Draye* .
Dominic E. Draye

# STATUTORY ADDENDUM

ADDENDUM A

Statutes, Regulations, and Constitutional Provisions


| Statutes | Addendum Page |
|---|---|
| | |
| 5 U.S.C. § 706 | 1-ADD |
| 28 U.S.C. § 2321 | 2-ADD |
| 28 U.S.C. § 2342 | 3-ADD |
| 28 U.S.C. § 2344 | 4-ADD |
| 45 U.S.C. § 701 | 5-ADD |
| 45 U.S.C. § 741 | 7-ADD |
| 45 U.S.C. § 748 | 14-ADD |
| 45 U.S.C. § 1101 | 17-ADD |
| 45 U.S.C. § 1102 | 18-ADD |
| 49 U.S.C. § 10501 | 19-ADD |
| 49 U.S.C. § 10901 | 22-ADD |
| 49 U.S.C. § 10903 | 24-ADD |

**5 U.S.C. § 706. Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be—

> **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> **(B)** contrary to constitutional right, power, privilege, or immunity;
>
> **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> **(D)** without observance of procedure required by law;
>
> **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**28 U.S.C. § 2321. Judicial Review of Board's Orders and Decisions; Procedure Generally; Process**

(a) Except as otherwise provided by an Act of Congress, a proceeding to enjoin or suspend, in whole or in part, a rule, regulation, or order of the Surface Transportation Board shall be brought in the court of appeals as provided by and in the manner prescribed in chapter 158 of this title.

(b) The procedure in the district courts in actions to enforce, in whole or in part, any order of the Surface Transportation Board other than for payment of money or the collection of fines, penalties, and forfeitures, shall be as provided in this chapter.

(c) The orders, writs, and process of the district courts may, in the cases specified in subsection (b) and in enforcement actions and actions to collect civil penalties under subtitle IV of title 49, run, be served and be returnable anywhere in the United States.

28 U.S.C. § 2342. Jurisdiction of Court of Appeals

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—

**(1)** all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47;

**(2)** all final orders of the Secretary of Agriculture made under chapters 9 and 20A of title 7, except orders issued under sections 210(e), 217a, and 499g(a) of title 7;

**(3)** all rules, regulations, or final orders of—

> **(A)** the Secretary of Transportation issued pursuant to section 50501, 50502, 56101-56104, or 57109 of title 46 or pursuant to part B or C of subtitle IV, subchapter III of chapter 311, chapter 313, or chapter 315 of title 49; and
>
> **(B)** the Federal Maritime Commission issued pursuant to section 305,[1] 41304, 41308, or 41309 or chapter 421 or 441 of title 46;

**(4)** all final orders of the Atomic Energy Commission made reviewable by section 2239 of title 42;

**(5)** all rules, regulations, or final orders of the Surface Transportation Board made reviewable by section 2321 of this title;

**(6)** all final orders under section 812 of the Fair Housing Act; and

**(7)** all final agency actions described in section 20114(c) of title 49.

Jurisdiction is invoked by filing a petition as provided by section 2344 of this title.

## 28 U.S.C. § 2344. Review of Orders; Time; Notice; Contents of Petition; Service

On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies. The action shall be against the United States. The petition shall contain a concise statement of—

(1) the nature of the proceedings as to which review is sought;

(2) the facts on which venue is based;

(3) the grounds on which relief is sought; and

(4) the relief prayed.

The petitioner shall attach to the petition, as exhibits, copies of the order, report, or decision of the agency. The clerk shall serve a true copy of the petition on the agency and on the Attorney General by registered mail, with request for a return receipt.

## 45 U.S.C. § 701. Congressional Declaration of Policy

### (a) Findings

The Congress finds and declares that—

(1) Essential rail service in the midwest and northeast region of the United States is provided by railroads which are today insolvent and attempting to undergo reorganization under the Bankruptcy Act.

(2) This essential rail service is threatened with cessation or significant curtailment because of the inability of the trustees of such railroads to formulate acceptable plans for reorganization. This rail service is operated over rail properties which were acquired for a public use, but which have been permitted to deteriorate and now require extensive rehabilitation and modernization.

(3) The public convenience and necessity require adequate and efficient rail service in this region and throughout the Nation to meet the needs of commerce, the national defense, the environment, and the service requirements of passengers, United States mail, shippers, States and their political subdivisions, and consumers.

(4) Continuation and improvement of essential rail service in this region is also necessary to preserve and maintain adequate national rail services and an efficient national rail transportation system.

(5) Rail service and rail transportation offer economic and environmental advantages with respect to land use, air pollution, noise levels, energy efficiency and conservation, resource allocation, safety, and cost per ton-mile of movement to such extent that the preservation and maintenance of adequate and efficient rail service is in the national interest.

(6) These needs cannot be met without substantial action by the Federal Government.

**(b) Purposes**

It is therefore declared to be the purpose of Congress in this chapter to provide for—

**(1)** the identification of a rail service system in the midwest and northeast region which is adequate to meet the needs and service requirements of this region and of the national rail transportation system;

**(2)** the reorganization of railroads in this region into an economically viable system capable of providing adequate and efficient rail service to the region;

**(3)** the establishment of the United States Railway Association, with enumerated powers and responsibilities;

**(4)** the establishment of the Consolidated Rail Corporation, with enumerated powers and responsibilities;

**(5)** assistance to States and local and regional transportation authorities for continuation of local rail services threatened with cessation; and

**(6)** necessary Federal financial assistance at the lowest possible cost to the general taxpayer.

## 45 U.S.C. § 741. Formation and Structure

### (a) Establishment

There shall be established within 300 days after January 2, 1974, in accordance with the provisions of this section, a corporation to be known as the Consolidated Rail Corporation or such other corporate name as may be duly adopted by the Corporation.

### (b) Status

The Corporation shall be a for-profit corporation established under the laws of a State and shall not be an agency or instrumentality of the Federal Government. The Corporation shall be deemed a rail carrier subject to part A of subtitle IV of Title 49, shall be subject to the provisions of this Act and, to the extent not inconsistent with such Act and subtitle IV of Title 49, shall be subject to applicable State law. The principal office of the Corporation or of its principal railroad operating subsidiary shall be located in Philadelphia in the Commonwealth of Pennsylvania.

### (c) Incorporators

(1) The members of the executive committee of the Association shall be the incorporators of the Corporation and shall take whatever steps are necessary to establish the Corporation, including the filing of articles of incorporation.

(2) Notwithstanding any provision of State law, after February 5, 1976, the members of the executive committee of the Association (including duly authorized representatives of members who are authorized by this chapter to be represented) and the chief executive officer and chief operating officer of the Corporation shall adopt the bylaws of the Corporation and serve as the Board of Directors of the Corporation until all members of the Board of Directors of the Corporation have been selected in accordance with subsection (d) of this section. The chief executive officer shall serve as chairman of such Board until a chairman thereof is selected

pursuant to subsection (d) of this section, after which time such chairman shall serve at the pleasure of such Board.

**(d) Board of Directors**

**(1)** Notwithstanding any provision of State law, the articles of incorporation and bylaws of the Corporation shall provide that the Board of Directors of the Corporation shall consist of 13 members selected in accordance with the articles and bylaws of the Corporation, as follows:

**(A)** six individuals selected by the holders of the Corporation's debentures and series A preferred stock voting as one class, with every $100 principal amount of debentures, and every $100 liquidation amount of series A preferred stock each receiving one vote for directors;

**(B)** three individuals selected by the holders of the Corporation's series B preferred stock; and

**(C)** two individuals selected by the holders of the Corporation's common stock.

**(2)** The chief executive officer and the chief operating officer of the Corporation shall also serve on the Board, but the chief executive officer and chief operating officer of the Corporation shall not be entitled to vote on the election or removal of either. In the event a vacancy occurs on the Board of Directors due to death, disability or resignation of a director, such vacancy shall be filled only by a vote of the holders of the class of securities that initially elected such director.

**(e) Initial capitalization**

**(1)** The Corporation is authorized to issue debentures, series A preferred stock, series B preferred stock, common stock, contingent interest notes, and other securities.

(2) Debentures and series A preferred stock shall be issued initially to the Association. Series B preferred stock and common stock shall be issued initially to the estates of railroads in reorganization in the region, to railroads leased, operated, and controlled by railroads in reorganization in the region, and to other persons leased, operated or controlled by a railroad in reorganization who are transferors of rail properties in exchange for rail properties transferred to the Corporation pursuant to the final system plan. Notwithstanding any other provisions of State or Federal law, the series B preferred stock and common stock shall have terms and conditions not inconsistent with the final system plan. As a condition of its investment in the Corporation, the Association may require that the Corporation adopt limitations consistent with the final system plan on the circumstances under which dividends on the series B preferred stock and common stock are payable so long as any of the debentures or series A preferred stock are outstanding. Notwithstanding anything to the contrary in the final system plan, the initial authorized number of shares of series B preferred stock may be 35,000,000, and the Corporation may issue initially for the purpose of the deposit required under section 743(a)(1) of this title such numbers of shares of series B preferred and common stock as the Association shall certify to the Special Court pursuant to section 719(c)(1)(3)[1] of this title, including any modifications in such numbers of shares as may be ordered by the Special Court for the purpose of, and in connection with, such deposit and certification.

**(f) Officers**

The officers of the Corporation shall include a chief executive officer and a chief operating officer, who shall be appointed by the Board of Directors and who shall serve at the pleasure of the Board; and such other officers as shall be provided for in the bylaws of the Corporation.

**(g) Voting trustees**

For and during the period between the deposit of securities of the Corporation with the special court, in accordance with section 743(a) of this title, and the distribution of such securities, in accordance with

section 743(c) of this title, the special court shall, within 30 days after the date of conveyance pursuant to section 743(b)(1) of this title, appoint one or more voting trustees for each class of securities which is so deposited. Such voting trustees shall, on behalf of the distributees, exercise the rights of the holders of such securities as their interests may appear. Within 30 days after such appointment, such voting trustees shall select members of the Board of Directors of the Corporation on behalf of the holders of the class of securities whose rights they exercise pursuant to this subsection.

### (h) Annual report

The Corporation shall transmit to the Congress and the President, not later than 90 days after the end of each fiscal year, a comprehensive and detailed report on all activities and accomplishments of the Corporation during the preceding fiscal year.

### (i) Liability of directors

No director of the Corporation shall be liable, for money damages or otherwise, to any party by reason of the fact that such person is or was a director, if, with respect to the subject matter of the action, suit, or proceeding, such person was fulfilling a duty which he in good faith reasonably believed to be required by law or vested in him in his capacity as a director of the Association or as an officer of the United States. The United States shall indemnify such person against all judgments, amounts paid in settlement, and costs and expenses (including fees of accountants, experts, and attorneys), actually and reasonably incurred in connection with any such action, suit, or proceeding in which such person is determined to have met such standard of conduct. This subsection shall not be construed to grant any immunity from any criminal law of the United States.

### (j) Signal systems

If, within two years after August 13, 1981, the Corporation applies for the permission of the Secretary to substitute manual block signal systems for automatic block signal systems on lines on which less than

20,000,000 gross tons of freight are carried annually, the Secretary shall approve or disapprove such application within 90 days of its submission.

**(k) Governing provisions after sale**

The provisions of this chapter shall not apply to the Corporation and to activities and other actions and responsibilities of the Corporation and its directors and employees after the sale date, other than with regard to—

**(1)** section 702 of this title;

**(2)** section 711(d) of this title;

**(3)** section 713 of this title, but only with respect to information relating to proceedings before the special court established under section 719(b) of this title;

**(4)** section 719 of this title, other than subsection (f) thereof;

**(5)** section 726(f)(8) of this title, but only as such authority applies to activities related to the ESOP and related trust before the sale date;

**(6)** section 726(f)(9) of this title, but only as such indemnification applies to activities relating to the ESOP and related trust before the sale date;

**(7)** section 726(f)(10) of this title with respect to all securities of the Corporation issued or transferred in connection with the public offering under the Conrail Privatization Act and all securities of ConRail Equity Corporation and all interests in the ESOP;

**(8)** section 727(c) and (e) of this title;

**(9)** subsection (b) of this section, but only with respect to matters covered by the last sentence of such subsection;

**(10)** subsection (i) of this section, but only as such authority applies to service as a director of the Corporation before the sale of the interest of the United States in the common stock of the Corporation;

**(11)** section 742 of this title, but only to the extent of (A) the creation and maintenance of the power and authority of the Corporation to operate rail service and to rehabilitate, improve, and modernize rail properties, and (B) the creation and maintenance of the powers of the Corporation as a railroad in any State in which it operates as of the sale date;

**(12)** section 743(b)(1) and (2) of this title, but only to the extent of establishing the legal effect of the conveyance of property ordered and of the deeds and other instruments executed, acknowledged, delivered, or recorded in connection therewith and the quality of title acquired in such property;

**(13)** section 743(b)(3)(B) of this title with respect to the effect of an assignment, conveyance, or assumption as set forth in the last sentence of such subparagraph (B);

**(14)** section 743(b)(5) of this title;

**(15)** section 743(b)(6) of this title, but only with respect to establishing and maintaining the rights of the Corporation with respect to, limiting its obligations with respect to, and establishing the status of, the employee pension and welfare benefit plans transferred to the Corporation thereunder and with respect to the exclusivity of the jurisdiction of the special court and the limitation of jurisdiction of other courts;

**(16)** section 743(e) of this title;

**(17)** section 744 of this title, but only with respect to the finality of abandonments completed before the sale date pursuant to the authority thereof;

**(18)** section 745 of this title, but only as to the effect, and continuing administration, of supplemental transactions consummated before the sale date;

**(19)** section 748 of this title, but only (A) as to the finality of abandonments completed before the sale date and (B) as to abandonments of lines where a notice or notices of insufficient revenues with respect to such lines have been filed before November 1, 1985;

**(20)** section 791(a)(2) of this title, but only with respect to activities before the sale date;

**(21)** section 791(b)(2) and (b)(3) of this title, but only with respect to issuance of and transactions in any security of the Corporation before the sale date;

**(22)** section 797a(e) of this title;

**(23)** section 797b of this title;

**(24)** section 797c of this title;

**(25)** sections 797e(a), 797f, and 797g(a) of this title, but only insofar as they establish part of the prevailing status quo for the Corporation's employees' rates of pay, rules, and working conditions, such provisions to continue to apply unless changed pursuant to section 156 of this title;

**(26)** section 797h of this title;

**(27)** section 797i(b)(1) of this title;

**(28)** section 797j of this title; and

**(29)** section 797m of this title, but only with regard to disputes or controversies specified in such section that arose before the sale date.

45 U.S.C. § 748. Abandonments

## (a) General

The Corporation may, in accordance with this section, file with the Commission an application for a certificate of abandonment for any line which is part of the system of the Corporation. Any such application shall be governed by this section and shall not, except as specifically provided in this section, be subject to the provisions of chapter 109 of Title 49.

## (b) Applications for abandonment

Any application for abandonment that is filed by the Corporation under this section before December 1, 1981, shall be granted by the Commission within 90 days after the date such application is filed unless, within such 90-day period, an offer of financial assistance is made in accordance with subsection (d) of this section with respect to the line to be abandoned.

## (c) Notice of insufficient revenues

**(1)** The Corporation may, prior to November 1, 1985, file with the Commission a notice of insufficient revenues for any line which is part of the system of the Corporation.

**(2)** At any time after the 90-day period beginning with the filing of a notice of insufficient revenues for a line, the Corporation may file an application for abandonment for such line. An application for abandonment that is filed by the Corporation under this subsection for a line for which a notice of insufficient revenues was filed under paragraph (1) shall be granted by the Commission within 90 days after the date such application is filed unless, within such 90-day period, an offer of financial assistance is made in accordance with subsection (d) of this section with respect to such line.

## (d) Offers of financial assistance

**(1)** The provisions of section 10904 of Title 49 (including the timing requirements of subsection (d) thereof) shall apply to any offer of financial assistance under subsection (b) or (c) of this section.

**(2)** The Corporation shall provide any person that intends to make an offer of financial assistance under subsection (b) or (c) of this section with such information as the Commission may require.

**(e) Liquidation**

**(1)** If any application for abandonment is granted under subsection (b) of this section, the Commission shall, as soon as practicable, appraise the net liquidation value of the line to be abandoned, and shall publish notice of such appraisal in the Federal Register.

**(2)** Appraisals made under paragraph (1) shall not be appealable.

**(3)(A)** If, within 120 days after the date on which an appraisal is published in the Federal Register under paragraph (1), the Corporation receives a bona fide offer for the sale, for 75 percent of the amount at which the liquidation value of such line was appraised by the Commission, of the line to be abandoned, the Corporation shall sell such line and the Commission shall, unless the parties otherwise agree, establish an equitable division of joint rates for through routes over such lines.

**(B)** If the Corporation receives no bona fide offer under subparagraph (A), within such 120-day period, the Corporation may abandon or dispose of the line as it chooses, except that the Corporation may not dismantle bridges, or other structures (not including rail, signals, and other rail facilities) for 120 days thereafter. The Secretary may require that bridges or other structures (not including rail, signals, and other rail facilities), not be dismantled for an additional 8 months if he assumes all liability of any sort related to such property.

**(4)** If the purchaser under paragraph (3)(A) of this subsection of any line of the Corporation abandons such line within five years after

such purchase, the proceeds of any track liquidations shall be paid into the general fund of the Treasury of the United States.

**(f) Employee protection**

The provisions of section 10903(b)(3) of Title 49 shall not apply to any abandonment granted under this section. Any employee who was protected by the compensatory provisions of subchapter V of this chapter immediately prior to August 13, 1981, who is deprived of employment by such an abandonment shall be eligible for employee protection under section 797 of this title.

## 45 U.S.C. § 1101. Congressional Findings and Declarations

The Congress finds and declares that—

(1) the processes set in motion by the Regional Rail Reorganization Act of 1973 have failed to create a self-sustaining railroad system in the Northeast region of the United States and have cost United States taxpayers many billions of dollars over original estimates;

(2) current arrangements for the provision of rail freight and commuter service in the Northeast and Midwest regions of the United States are inadequate to meet the transportation needs of the public and the needs of national security;

(3) although the Federal Government has provided billions of dollars in assistance for Conrail and its employees, the Federal interest in ensuring the flow of interstate commerce through rail service in the private sector has not been achieved, and the protection of interstate commerce requires Federal intervention to preserve essential rail service in the private sector;

(4) the provisions for protection of employees of bankrupt railroads contained in the Regional Rail Reorganization Act of 1973 have resulted in the payment of benefits far in excess of levels anticipated at the time of enactment, have imposed an excessive fiscal burden on the Federal taxpayer, and are now an obstacle to the establishment of improved rail service and continued rail employment in the Northeast region of the United States; and

(5) since holding Conrail liable for employee protection payments would destroy its prospects of becoming a profitable carrier and further injure its employees, an alternative employee protection system must be developed and funded.

## 45 U.S.C. § 1102. Statement of Purpose

It is therefore declared to be the purpose of the Congress in this subtitle to provide for—

(1) the removal by a date certain of the Federal Government's obligation to subsidize the freight operations of Conrail;

(2) transfer of Conrail commuter service responsibilities to one or more entities whose principal purpose is the provision of commuter service; and

(3) an orderly return of Conrail freight service to the private sector.

## 49 U.S.C. § 10501. General Jurisdiction

**(a)**

**(1)** Subject to this chapter, the Board has jurisdiction over transportation by rail carrier that is—

**(A)** only by railroad; or

**(B)** by railroad and water, when the transportation is under common control, management, or arrangement for a continuous carriage or shipment.

**(2)** Jurisdiction under paragraph (1) applies only to transportation in the United States between a place in—

**(A)** a State and a place in the same or another State as part of the interstate rail network;

**(B)** a State and a place in a territory or possession of the United States;

**(C)** a territory or possession of the United States and a place in another such territory or possession;

**(D)** a territory or possession of the United States and another place in the same territory or possession;

**(E)** the United States and another place in the United States through a foreign country; or

**(F)** the United States and a place in a foreign country.

**(b)** The jurisdiction of the Board over—

**(1)** transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

**(2)** the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

**(c)**

**(1)** In this subsection—

**(A)** the term "local governmental authority"--

**(i)** has the same meaning given that term by section 5302 of this title; and

**(ii)** includes a person or entity that contracts with the local governmental authority to provide transportation services; and

**(B)** the term "public transportation" means transportation services described in section 5302 of this title that are provided by rail.

**(2)** Except as provided in paragraph (3), the Board does not have jurisdiction under this part over—

**(A)** public transportation provided by a local government authority; or

**(B)** a solid waste rail transfer facility as defined in section 10908 of this title, except as provided under sections 10908 and 10909 of this title.

**(3)**

**(A)** Notwithstanding paragraph (2) of this subsection, a local governmental authority, described in paragraph (2), is subject to applicable laws of the United States related to—

**(i)** safety;

**(ii)** the representation of employees for collective bargaining; and

**(iii)** employment, retirement, annuity, and unemployment systems or other provisions related to dealings between employees and employers.

**(B)** The Board has jurisdiction under sections 11102 and 11103 of this title over transportation provided by a local governmental authority only if the Board finds that such governmental authority meets all of the standards and requirements for being a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission that were in effect immediately before January 1, 1996. The enactment of the ICC Termination Act of 1995 shall neither expand nor contract coverage of employees and employers by the Railway Labor Act, the Railroad Retirement Act of 1974, the Railroad Retirement Tax Act, and the Railroad Unemployment Insurance Act.

**49 U.S.C. § 10901. Authorizing Construction and Operation of Railroad Lines**

**(a)** A person may--

> **(1)** construct an extension to any of its railroad lines;
>
> **(2)** construct an additional railroad line;
>
> **(3)** provide transportation over, or by means of, an extended or additional railroad line; or
>
> **(4)** in the case of a person other than a rail carrier, acquire a railroad line or acquire or operate an extended or additional railroad line,

only if the Board issues a certificate authorizing such activity under subsection (c).

**(b)** A proceeding to grant authority under subsection (a) of this section begins when an application is filed. On receiving the application, the Board shall give reasonable public notice, including notice to the Governor of any affected State, of the beginning of such proceeding.

**(c)** The Board shall issue a certificate authorizing activities for which such authority is requested in an application filed under subsection (b) unless the Board finds that such activities are inconsistent with the public convenience and necessity. Such certificate may approve the application as filed, or with modifications, and may require compliance with conditions (other than labor protection conditions) the Board finds necessary in the public interest.

**(d)**

> **(1)** When a certificate has been issued by the Board under this section authorizing the construction or extension of a railroad line, no other rail carrier may block any construction or extension

authorized by such certificate by refusing to permit the carrier to cross its property if--

**(A)** the construction does not unreasonably interfere with the operation of the crossed line;

**(B)** the operation does not materially interfere with the operation of the crossed line; and

**(C)** the owner of the crossing line compensates the owner of the crossed line.

**(2)** If the parties are unable to agree on the terms of operation or the amount of payment for purposes of paragraph (1) of this subsection, either party may submit the matters in dispute to the Board for determination. The Board shall make a determination under this paragraph within 120 days after the dispute is submitted for determination.

**49 U.S.C. § 10903. Filing and Procedure for Application to Abandon or Discontinue**

(a)

(1) A rail carrier providing transportation subject to the jurisdiction of the Board under this part who intends to—

(A) abandon any part of its railroad lines; or

(B) discontinue the operation of all rail transportation over any part of its railroad lines,

must file an application relating thereto with the Board. An abandonment or discontinuance may be carried out only as authorized under this chapter.

(2) When a rail carrier providing transportation subject to the jurisdiction of the Board under this part files an application, the application shall include—

(A) an accurate and understandable summary of the rail carrier's reasons for the proposed abandonment or discontinuance;

(B) a statement indicating that each interested person is entitled to make recommendations to the Board on the future of the rail line; and

(C)

(i) a statement that the line is available for subsidy or sale in accordance with section 10904 of this title,

(ii) a statement that the rail carrier will promptly provide to each interested party an estimate of the annual subsidy and minimum purchase price, calculated in accordance with section 10904 of this title, and

(iii) the name and business address of the person who is authorized to discuss the subsidy or sale terms for the rail carrier.

**(3)** The rail carrier shall—

**(A)** send by certified mail notice of the application to the chief executive officer of each State that would be directly affected by the proposed abandonment or discontinuance;
**(B)** post a copy of the notice in each terminal and station on each portion of a railroad line proposed to be abandoned or over which all transportation is to be discontinued;

**(C)** publish a copy of the notice for 3 consecutive weeks in a newspaper of general circulation in each county in which each such portion is located;

**(D)** mail a copy of the notice, to the extent practicable, to all shippers that have made significant use (as designated by the Board) of the railroad line during the 12 months preceding the filing of the application; and

**(E)** attach to the application filed with the Board an affidavit certifying the manner in which subparagraphs (A) through (D) of this paragraph have been satisfied, and certifying that subparagraphs (A) through (D) have been satisfied within the most recent 30 days prior to the date the application is filed.

**(b)**

**(1)** Except as provided in subsection (d), abandonment and discontinuance may occur as provided in section 10904.

**(2)** The Board shall require as a condition of any abandonment or discontinuance under this section provisions to protect the interests of employees. The provisions shall be at least as beneficial to those interests as the provisions established under sections 11326(a) and 24706(c)[1] of this title before May 31, 1998.

(c)

(1) In this subsection, the term "potentially subject to abandonment" has the meaning given the term in regulations of the Board. The regulations may include standards that vary by region of the United States and by railroad or group of railroads.

(2) Each rail carrier shall maintain a complete diagram of the transportation system operated, directly or indirectly, by the rail carrier. The rail carrier shall submit to the Board and publish amendments to its diagram that are necessary to maintain the accuracy of the diagram. The diagram shall—

(A) include a detailed description of each of its railroad lines potentially subject to abandonment; and

(B) identify each railroad line for which the rail carrier plans to file an application to abandon or discontinue under subsection (a) of this section.

(d) A rail carrier providing transportation subject to the jurisdiction of the Board under this part may—

(1) abandon any part of its railroad lines; or

(2) discontinue the operation of all rail transportation over any part of its railroad lines;

only if the Board finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance. In making the finding, the Board shall consider whether the abandonment or discontinuance will have a serious, adverse impact on rural and community development.

(e) Subject to this section and sections 10904 and 10905 of this title, if the Board—

(1) finds public convenience and necessity, it shall--

**(A)** approve the application as filed; or

**(B)** approve the application with modifications and require compliance with conditions that the Board finds are required by public convenience and necessity; or

**(2)** fails to find public convenience and necessity, it shall deny the application.