ORAL ARGUMENT NOT YET SCHEDULED

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

Nos. 25-1255 (lead) and 25-1268
(Consolidated)

READING INTERNATIONAL, INC.,
*Petitioner*

v.

SURFACE TRANSPORTATION BOARD AND
UNITED STATES OF AMERICA,
*Respondents*

CITY OF PHILADELPHIA,
*Intervenor*

ON PETITION FOR REVIEW OF DECISION BY THE
SURFACE TRANSPORTATION BOARD

# READING INTERNATIONAL, INC.'S FINAL CONSOLIDATED REPLY BRIEF TO RESPONDENTS' AND INTERVENOR'S RESPONSE BRIEFS

Dominic Draye
*Counsel of Record*
GREENBERG TRAURIG, LLP
2101 L Street, N.W., Suite 1000
Washington, DC 20037
(202) 331-3168

John Voorhees
GREENBERG TRAURIG, LLP
1144 15th Street, Suite 3300
Denver, CO 80202
(303) 685-7465

Jennifer Bartlett
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, TX 75201
(214) 665-3729

*Counsel for Reading International, Inc.*

June 22, 2026

## TABLE OF CONTENTS

TABLE OF CONTENTS ........ iii

GLOSSARY ........ x

STATUTES AND REGULATIONS ........ 1

SUMMARY OF THE ARGUMENT ........ 2

ARGUMENT ........ 4

I. The STB Did Not Have Jurisdiction To Decide The City's Petition. ........ 4

II. Reading Sufficiently Raised Residual Interests. ........ 9

- A. The STB's argument that Reading never argued it had a residual common carrier interest is contradicted by the record. ........ 9
- B. Reading's status was also part of the regulatory jurisdictional question before the STB. ........ 12

III. The Branch Remains Under The STB's Regulatory Jurisdiction Independent Of Reading's Status As A Rail Carrier ........ 13

- A. The STB has regulatory jurisdiction over rail lines, not just transportation by rail carrier. ........ 13
- B. There is no requirement of an operating rail carrier for the STB to have regulatory jurisdiction over the Branch. ........ 16

IV. Conrail's abandonment did not eliminate regulatory jurisdiction over the Branch. ........ 21

- A. The 3R Act did not extinguish Reading's rail interests in the Branch and did not remove it from STB jurisdiction. ........ 21
- B. The STB's "line sale" argument is improper under *Chenery*, and the analogy is legally and factually incorrect. ........ 25
- C. Evidence supports Reading's position that Conrail could not abandon what it did not own. ........ 27

V. The STB and City Mischaracterize Reading's Reliance On *Scioli Turco*, Its Holding, And The STB's Responsibility To Meaningfully Address It. ........ 30

A. *Scioli Turco* Is Persuasive Authority Addressing the Identical Issues. .... 30

B. The STB and City mischaracterize *Scioli Turco*. .... 31

VI. Reading Did Not Have An Affirmative Duty To Take Action To Preserve Its Rights. .... 32

CONCLUSION .... 33

CERTIFICATE OF COMPLIANCE .... 36

CERTIFICATE OF SERVICE .... 37

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re Bos. & Me. Corp.*,
600 F.2d 307 (1st Cir. 1979) .......... 22

*Briggs ex Rel. Briggs v. Massanari*,
248 F.3d 1235 (10th Cir. 2001) .......... 29

*Carroll Coll., Inc. v. N.L.R.B.*,
558 F.3d 568 (D.C. Cir. 2009) .......... 8

*City of Jersey City v. Consol. Rail Corp.*,
968 F. Supp. 2d 302 (D.D.C. 2013), aff'd, No. 13-7175, 2014 WL 1378306 (D.C. Cir. Feb. 19, 2014) .......... 22

*Consol. Rail Corp. v. United States*,
883 F. Supp. 1565 (Reg'l Rail Reorg. Ct. 1995) .......... 9

*Fla. Dept. of Transp.—Acquisition Exemption—Certain Assets of CSX Transp., Inc*,
FD 35110, 2010 WL 5104870, at *6 .......... 15

*Flores v. Sec'y of Health, Educ. & Welfare*,
228 F. Supp. 877 (D.P.R. 1964) .......... 31

*Jicarilla Apache Nation v. DOI*,
613 F.3d 1112 (D.C. Cir. 2010) .......... 31

*Kalb v. Feuerstein*,
308 U.S. 433 (1940) .......... 8

*Mitchell v. Christopher*,
996 F.2d 375 (D.C. Cir. 1993) .......... 17

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 29

*NetworkIP, LLC v. FCC*,
548 F.3d 116 (D.C. Cir. 2008) .......... 11

*Matter of Penn Cent. Transp. Co.*,
553 F.2d 12 (3d Cir. 1977) .......... 22

*Plaquemines Port, Harbor & Terminal Dist. v. Fed. Mar. Comm'n*,
838 F.2d 536 (D.C. Cir. 1988) .......... 8

*Preseault v. ICC*,
494 U.S. 1 (1990) .......... 18

*Matter of Reading Co.*,
115 F.3d 1111 (3d Cir. 1997) .......... 23

*Richmond Waterfront Indus. Park, LLC v. Philadelphia Belt Line R.R. Co.*,
2023 WL 3337301 (Pa.Com.Pl.) .......... 14

*Schweitzer v. Consol. Rail Corp.*,
65 B.R. 794 (E.D. Pa. 1986) .......... 19-20, 23

*Scioli Turco, Inc. v. Philadelphia & Reading R.R. Co.*,
No. CV 21-563, 2023 WL 7646535 (E.D. Pa. Nov. 14, 2023) .......... 14, 22, 28, 30-32

*SEC v. Chenery*,
318 U.S. 80 (1943) .......... 3, 16, 24, 25, 27

*Shea v. Kerry*,
796 F.3d 42 (D.C. Cir. 2015) .......... 12, 13

*State of Maine, Dep't of Transp.-Acquisition & Operation Exemption-Maine Cent. R.R. Co.*,
8 I.C.C.2d 835 (I.C.C. May 20, 1991) .......... 18-19

*Trustees of Diocese of Vermont v. State*,
145 Vt. 510, 496 A.2d 151 (1985) .......... 18

*Trustees of Penn Cent. Transp. Co. v. USRA*,
463 F. Supp. 1321 (Reg'l Rail Reorg. Ct. 1979) .......... 4

*U.S. Dep't of Commerce, Patent & Trademark Office v. FLRA*,
672 F.3d 1095 (D.C. Cir. 2012) .......... 11

*United States v. Cotton*,
535 U.S. 625 (2002) .......... 7

*Util. Air. Reg. Grp. v. EPA*,
573 U.S. 302 (2014) .......... 31

### Administrative Cases

*Allegheny Valley R.R. Co.--Petition for Declaratory Order*, No. FD 35239, 2009 WL 2966165 (STB Sept. 15, 2009) ................................ 4, 9

*Angeles A. Zorzi, Tr. of the Angeles A. Zorzi Living Tr., & Antonio Aja, Jr. & Virginia D. Aja, Trustees of the Antonio Aja, Jr. Tr. & the Virginia D. Aja Trust Petition for Declaratory Order*, No. FD 36016, 2017 WL 431330 (STB Jan. 30, 2017) ................................................................. 17-18, 20

*Beaufort R.R. Co., Inc.--Modified Rail Certificate*, FD No. 34943, 2009 WL 2170143 (STB July 20, 2009)..... 22, 25, 27-28

*City of Austin, Texas-Acquisition-Southern Pacific Transportation Co.*, FD No. 30861(Sub-No. A), 1986 WL 1166762 (ICC Nov. 4, 1986).... 14-15, 18

*Consol. Rail Corp.-Abandonment Exemption-in Hudson Cnty., N.J. CSX Transp., Inc.-Discontinuance of Serv. Exemption-in Hudson Cnty., N.J. Norfolk S. Ry. Co.-Discontinuance of Serv. Exemption-in Hudson Cnty., N.J.*, No. AB 167, 2022 WL 3595013 (STB Aug. 18, 2022) .... 17, 20, 21

*Consol. Rail Corp.-Discontinuance Exemption-in Montgomery & Bucks Ctys., Pa*, No. AB-167, 1997 WL 54949 (STB Feb. 3, 1997) ..................... 24-25

*Consolidated Rail Corporation v. STB ("Conrail")*, 571 F.3d 13 (D.C. Cir. 2009) ................................................... 2, 4, 6, 8

*Landowners Motion for Declaratory Order & Injunctive Relief*, 2020 WL 468384 (STB Jan. 24, 2020) ............................................... 20

*Midwest Generation, LLC-Exemption from 49 U.S.C. 10901-for Constr. in Will Cnty., Il Midwest Generation, LLC-Petition for Line Crossing Auth. Under 49 U.S.C. 10901(d)*, No. 34060, 2002 WL 437218 (STB Mar. 20, 2002), modified, Fed. Carr. Cas. (CCH) ¶ 37107 (STB Oct. 3, 2002)........................ 14, 18, 22

*Norfolk & W. Ry. Co.--Abandonment Exemption—Between Kokomo & Rochester in Howard, Miami, & Fulton Ctys.*, No. AB-290, 2005 WL 1030535 (STB May 3, 2005) ........................... 18

*R. J. Corman R.R. Prop., LLC-Abandonment Exemption-in Campbell Cnty. Tenn.*, No. AB 1296, 2024 WL 896881 (STB Mar. 1, 2024) .......... 17

*Seminole Gulf Ry., Inc. -- Abandonment Exemption -- in Lee Cnty., Fl.*, No. AB-400, 1995 WL 139760 (ICC Mar. 30, 1995) .......... 25-26

*Seminole Gulf Ry., Inc.--Abandonment Exemption--in Lee Cnty., Fl*, No. AB-400, 1994 WL 708551 (ICC Dec. 12, 1994) .......... 25-26

*Sonoma-Marin Area Rail Transit Dist.-Acquisition Exemption-in Marin Cnty., Cal.*,, FD 35732, 2013 WL 3601830 (STB served July 15, 2013) .......... 15

*Tesoro Ref. & Mktg. Co., LLC Petition for Declaratory Order*, No. FD 36041, 2016 WL 6809953 (STB Nov. 14, 2016) .......... 30-31

*United Transp. Union v. STB*, 114 F.3d 1242 (D.C. Cir. 1997) .......... 8

*Victor Wheeler, et al.--Petition for Declaratory Order--Rail Line in Erie Cnty., Pa Bessemer & Lake Erie R.R. Co.—Abandonment Exemption--in Erie Cnty., Pa* No. 1FN1OFN, 2008 WL 3971090 (S.T.B. Aug. 26, 2008) .......... 17, 20, 22, 26, 27

**Rules**

Fed. R. App. P. 28(i) .......... 2

**Statutes**

45 U.S.C. § 719(e)(2) .......... 4

45 U.S.C. § 748 .......... 27

45 U.S.C. § 791(b)(4) .......... 21-22

49 U.S.C § 10501(b)(1) .......... 16

49 U.S.C § 10501(b)(2) .......... 13-14, 15-16

49 U.S.C. § 10901 .......... 14

49 U.S.C § 10901(a)(4) .......... 19

49 U.S.C. § 10903 .......... 10, 14, 18, 21, 24, 31, 33

49 U.S.C. § 10906 .......... 14
49 U.S.C. § 10907 .......... 14
Bankruptcy Act § 77 .......... 21-22

# GLOSSARY

| | |
|---|---|
| 3R Act | Regional Rail Reorganization Act of 1973, Pub. L. No. 93-236, 87 Stat. 985 (1974) (codified as amended at 45 U.S.C. §§ 701-793) |
| Branch | Ninth Street Branch |
| Conrail | Consolidated Rail Corporation |
| FSP | Final System Plan |
| ICC | Interstate Commerce Commission |
| ICCTA | Interstate Commerce Commission Termination Act |
| NERSA | Northeast Rail Service Act of 1981 |
| SEPTA | Southeastern Pennsylvania Transportation Authority |
| STB | Surface Transportation Board |
| USRA | United States Railway Association |

## STATUTES AND REGULATIONS

The relevant statutes, regulations, and constitutional provisions appear in Addendum A to this brief.

## SUMMARY OF THE ARGUMENT

Like *Consolidated Rail Corporation v. STB ("Conrail")*, 571 F.3d 13, 18 (D.C. Cir. 2009), this case "begin[s]—and end[s]" with a determination that the STB did not have jurisdiction to consider the City's petition for a declaratory order because it requires the interpretation of what interests were conveyed under the 3R Act. Reading therefore agrees with and adopts the jurisdictional argument advanced by Petitioner Strohmeyer in the consolidated case (filed after Reading's Opening Brief) that the 3R Act permits the City to bring its case only in the "Special Court," which in this case is the United States District Court for the District of Columbia. Fed. R. App. P. 28(i) (authorizing "adopt[ion] by reference"). That court has exclusive subject matter jurisdiction over the interpretation of the 3R Act, the Final System Plan ("FSP"), and interests conveyed by deeds under the 3R Act. Mr. Strohmeyer has raised a serious jurisdictional defect that this Court should address at the outset.

Even if the STB had jurisdiction, its decision was arbitrary, capricious, and contrary to law. The STB fundamentally erred when it treated Conrail's 1983 abandonment of its operating easement as an abandonment of Reading's Ninth Street Branch ("Branch") line, even

though Conrail did not own the line and Reading never abandoned it. The scope of Conrail's abandonment is the core of this case. The STB ignored critical evidence that demonstrated its continuing jurisdiction and failed to meaningfully address a federal district court decision that reviewed the same operative facts and statutes and determined that the STB still had jurisdiction over the Branch.

Respondents Surface Transportation Board and the United States (collectively the "STB") and the City do not and cannot defend the STB's errors. They instead rely on misplaced arguments and red herrings, many of which are precluded under *SEC v. Chenery*, 318 U.S. 80, 84 (1943), because the STB did not rely on those arguments in its decision below.

The STB wanted to pave the way for the City to condemn the Branch without satisfying the statutory abandonment procedure. In doing so, the STB ignored its statutory obligations, evidence in the record, and disregarded an on-point district court case. Accordingly, the STB's decision cannot stand.

## ARGUMENT

### I. The STB Did Not Have Jurisdiction To Decide The City's Petition.

The STB lacked jurisdiction to decide the City's Petition because doing so required the STB to interpret what interests Reading retained and conveyed to Conrail pursuant to the 3R Act, the FSP, deed(s), and conveyance orders. That role is reserved for the Special Court. The STB's decision should be vacated on that ground alone.

Under 45 U.S.C. § 719(e)(2), the Special Court has original and exclusive jurisdiction over any interpretive question related to the FSP, conveyance orders, and deeds, which can inform the question as to the scope of interests abandoned. *Conrail*, 571 F.3d at 18–19; *Allegheny Valley R.R. Co.--Petition for Declaratory Order*, No. FD 35239, 2009 WL 2966165, at *1–2 (STB Sept. 15, 2009); *Trustees of Penn Cent. Transp. Co. v. USRA*, 463 F. Supp. 1321, 1323 (Reg'l Rail Reorg. Ct. 1979).

The question of which interests Reading conveyed, which interests Conrail abandoned, and which interests Reading retained required an interpretation of the FSP and associated conveyance instruments. That antecedent question lies exclusively with the Special Court, not the STB. *Conrail*, 571 F.3d at 20.

Mr. Strohmeyer filed a motion of intent to participate and to dismiss the City's Petition, arguing the STB did not have subject matter jurisdiction to decide the exact nature of the interests Reading retained, which was necessary to resolve prior to the STB being able to determine the scope of Conrail's abandonment. Mot. to Dismiss 1-2, 34 (J.A.0209-0210, J.A.0242). The STB addressed Mr. Strohmeyer's challenge but stated there were "[n]o questions implicating the Special Court's jurisdiction" at issue. Order 6 (J.A.0277). It reasoned that the City did not "contest the meaning of the deed," the City accepted Reading's characterization of its interests, and Reading did not claim to be a carrier or have a common carrier obligation. Order 6 (J.A.0277). It explained that the only dispute centers on whether Reading's retained ownership interest, which was a question the STB believed it could address without interpreting the FSP, conveyance orders, or the deed. Order 6 (J.A.0277).

The STB was mistaken. The primary dispute is what interests Reading retained, what it conveyed to Conrail, and what Conrail abandoned, all of which require interpreting the FSP and conveyance documents.

Conrail abandoned its right to conduct freight operations, while clarifying that it did not own the line. Application (Pet., Ex. A) 1-2 (J.A. 0021-0022). Reading introduced evidence (that the STB ignored) in the form of a declaration by a former, long-time Conrail executive who attested that Reading conveyed only certain interests to Conrail pursuant to the FSP, and Reading retained residual interests. DiArenzo Decl. ¶¶ 4, 9, 12, 14, 15 (J.A.0090, J.A.0091, J.A.0092, J.A.0093-0094). Mr. DiArenzo came to his conclusion based on his knowledge and review of the 3R Act, the FSP, the Supplemental Report of the FSP, and the deeds. DiArenzo Decl. at ¶¶ 3, 5-8, 12, 15 (J.A.0089-0090, J.A.0090-0091, J.A.0092-0093). This is the type of evidence that this Court in *Conrail* considered important in its jurisdictional analysis. *Conrail*, 571 F.3d at 16–17 (testimony from Conrail's real estate director).

The STB's decision also discussed different segments that were listed for conveyance to Conrail (citing to the FSP), the types of interests conveyed, and then summarily concluded that Reading ceased being a rail carrier upon conveyance pursuant to the FSP. Order n.2, 8-10 (J.A.0272, J.A.0279-0281). The STB's decision that Conrail's abandonment extinguished its regulatory jurisdiction over the entire

Branch necessarily required it to determine the nature and scope of interests conveyed, which falls within the exclusive jurisdiction of the Special Court.

The City's brief in particular illustrates how the issues to be resolved require interpretation of the 3R Act, the FSP, and the deed. The City relied on the FSP's designation of the "portion of the Line" at issue. Intervenor's Br. 5. The City then categorically states the FSP's "designation meant that all of Reading Company's right, title, and interest would be transferred to Conrail, while trackage rights would be transferred to a third party." *Id.* (citing to FSP 261). Indeed, almost the whole of Section II(B)(1) of the City's brief discusses the purpose and scope of conveyances under the 3R Act and the FSP, which raises issues that are exclusively within the jurisdiction of the Special Court.

Although Reading did not challenge the STB's subject matter jurisdiction in the agency proceeding, Petitioner Strohmeyer did. Moreover, subject matter jurisdiction involves a court's power to hear a case and can never be waived or forfeited. *United States v. Cotton*, 535 U.S. 625, 630 (2002) (citations omitted). While the failure to challenge an agency's jurisdiction (as opposed to a court's) may be waived in certain

circumstances, *United Transp. Union v. STB*, 114 F.3d 1242, 1244–45 (D.C. Cir. 1997) that does not apply here given that this issue does not concern the scope of STB's authority to decide a case; rather, it concerns whether that matter is within the exclusive jurisdiction of the Special Court. *Kalb v. Feuerstein*, 308 U.S. 433, 444 (1940); *Carroll Coll., Inc. v. N.L.R.B.*, 558 F.3d 568, 574 (D.C. Cir. 2009); *Plaquemines Port, Harbor & Terminal Dist. v. Fed. Mar. Comm'n*, 838 F.2d 536, 542, n.3 (D.C. Cir. 1988).

The nature of the § 719(e)(2) jurisdictional defect exceeds ordinary agency jurisdiction or authority. Congress vested exclusive subject matter jurisdiction in a federal court "notwithstanding any other provision of law." This is supported by the text of the 3R Act, which provided that the FSP was "not subject to review by any court except in accordance with this section" and which delegated all decision making regarding the interpretation of the FSP and interests conveyed to the Special Court. *Id.* Instructively, the *Conrail* Court decided the STB lacked jurisdiction and vacated the STB's orders even though the STB's authority was challenged after the STB had issued its decision.

*Allegheny Valley R.R. Co.--Petition for Declaratory Order*, No. FIN 35239, 2009 WL 2966165, at *1–2 (STB Sept. 15, 2009).

This is not the first time these parties have been before the Special Court concerning this identical rail line. In *Consol. Rail Corp. v. United States*, the Special Court concluded it had jurisdiction to decide the nature of Conrail's, Reading's, SEPTA's, and the City's ownership and operational interests. *See* 883 F. Supp. 1565, 1571–72, 1577 (Reg'l Rail Reorg. Ct. 1995).

In sum, the Court should vacate the STB's decision because the City's Petition involved issues that the Special Court had to decide first.

## II. Reading Sufficiently Raised Residual Interests.

### A. The STB's argument that Reading never argued it had a residual common carrier interest is contradicted by the record.

The STB's leading argument runs headlong into the record. It asserts that Reading "never argued" residual rail or common carrier interests. Resp. Br. 18; *see also* Intervenor Br. 30. To the contrary, Reading asserted that it "never abandoned and still owns its interests in the Viaduct." Reply to City's Petition ("Reply") 1 (J.A.0068). Reading also explained that "Conrail's 'proposed abandonment' related 'only to Conrail's operation of the lines' because Conrail did not own the lines."

Reply 2, 5 (J.A.0069, J.A.0072). Notably, Reading did not limit the definition of the lines in that sentence to real property underlying the lines.

It also asserted that "Reading [] retained interests in the Viaduct…," and "Reading transferred certain operational rights…[t]he [FSP] did not convey the entirety of Reading's interests in the Viaduct to Conrail. Reading retained its pre-existing interests in the Viaduct." Reply 3, 5 (J.A.0070, J.A.0072). And again: "neither Reading nor any other party ever abandoned Reading's retained interests in the Viaduct under 49 U.S.C. § 10903." Reply 7 (J.A.0074). Reading further noted that "the Deed supports Reading's position and demonstrates that residual rights in the Branch, including the Viaduct reside with Reading." Reading Opp. and Mot. to Strike City's Mot. for Leave to File Reply ("Reading Opp.") 6 (J.A.0193).

Reading's key witness, Mr. DiArenzo, clarified that "Conrail's application to the ICC in 1983 only related to its freight operations on the Viaduct did not [sic] affect Reading's residual interests and retained parcels of the Viaduct, over which the STB retains jurisdiction." DiArenzo Decl. ¶ 15 (J.A.0093-0094). In support of its position that it

retained a residual common carrier interest and obligation, Reading explained that "[e]ven if certain interests are abandoned, rail interests and common carrier obligations can remain, over which the STB retains jurisdiction." Reading Reply to City's Motion to Strike ("Reply to MTS") n.4 (J.A.0263-0264); *see also* Reply 2, 6, 7, 11, 14, 15, 18 (J.A.0069, J.A.0073-0074, J.A.0078, J.A.0081-0082, J.A.0085).

The STB even concedes Reading argued that "rail interests and common-carrier obligations can remain" (Resp. Br. n.5) and relied on "residual interests" in Mr. DiArenzo's declaration—undercutting the STB's forfeiture argument. Reading is not required to use any specific magic words to preserve an argument as the STB suggests. *See U.S. Dep't of Commerce, Patent & Trademark Office v. FLRA*, 672 F.3d 1095, 1102 (D.C. Cir. 2012); *NetworkIP, LLC v. FCC*, 548 F.3d 116, 122 (D.C. Cir. 2008). Reading's demand that the STB respect its residual rights rather than permitting the City to take Reading's interests without compensation was the heart of the proceeding below. That the STB seeks refuge in forfeiture only testifies to the weakness of its merits position.

### B. Reading's status was also part of the regulatory jurisdictional question before the STB.

Reading also consistently maintained that the Branch remained under STB's regulatory jurisdiction[1] because Conrail's abandonment did not abandon Reading's interests, which remained regulated by the STB. This necessarily implies continuing rail regulatory status in addition to the real property interests. This sufficiently raised the issue below because Reading's arguments for STB jurisdiction "reasonably encompassed"—indeed, relied upon—Reading's residual and retained interests. *Shea v. Kerry*, 796 F.3d 42, 54 (D.C. Cir. 2015).

For example, Reading's argument that its retained interests in the Viaduct are under the STB's jurisdiction rested on the argument it had remaining rail (*i.e.,* residual common carrier) interests. Reply 2-3, 7 (J.A.0069-0070, J.A.0074); Reading Opp. 8 (J.A.0195).[2] Reading's entire argument is, in essence, that the STB still has jurisdiction over the Branch ***because*** Conrail's abandonment of its operations easement did not abandon Reading's interests, which would have removed the Branch

---

[1] This is distinct from the subject matter jurisdiction to decide what interests were conveyed, which is under the exclusive jurisdiction of the Special Court.

[2] *See also* Reply to MTS 2, 3, 6 (J.A.0262-0263, J.A.0266).

from STB jurisdiction and allowed the City to take it through condemnation. *See, e.g.,* Reading Opp. 9 (J.A.0196) ("[T]he *property* is subject to the jurisdiction of the STB because the entirety of interests was not abandoned.").

Even if Reading had not argued for a continuing common carrier obligation, the STB rested its ruling on that obligation, making it appropriate for Reading to address this issue on appeal. *Shea*, 796 F.3d at 54.

That the STB summarily dismissed Reading's argument does not mean that Reading did not raise it. Order at 9, n.16. As demonstrated, however, Reading more than sufficiently asserted that it retained a residual common carrier interest.

## III. The Branch Remains Under The STB's Regulatory Jurisdiction Independent Of Reading's Status As A Rail Carrier.

### A. The STB has regulatory jurisdiction over rail lines, not just transportation by rail carrier.

The STB retains regulatory jurisdiction over the Branch until it is abandoned, regardless of Reading's status as a rail carrier. It is therefore of no moment that Reading may not be a rail carrier.

The ICCTA grants the Board exclusive jurisdiction over rail facilities, not only "transportation by rail carrier." 49 U.S.C §

10501(b)(2); *Scioli Turco, Inc. v. Philadelphia & Reading R.R. Co.*, No. CV 21-563, 2023 WL 7646535, at *4 (E.D. Pa. Nov. 14, 2023); *Richmond Waterfront Indus. Park, LLC v. Philadelphia Belt Line R.R. Co.*, 2023 WL 3337301, at *3–4 (Pa.Com.Pl.). The statute does not include any requirement that the owner of the rail interest be a rail carrier. This is consistent with other provisions concerning STB jurisdiction independent of activity by a rail carrier. *See, e.g.,* 49 U.S.C. §§ 10901, 10903, 10906, 10907. Even if the STB and City are correct that Reading is a noncarrier, that does not change the fact that the STB retains jurisdiction over the Branch.

The fact that Reading does not currently provide rail transportation for compensation does not mean that it cannot possess a residual common carrier obligation or that the STB no longer has jurisdiction over the Branch. Noncarriers can possess a residual common carrier obligation. *Midwest Generation, LLC-Exemption from 49 U.S.C. 10901-for Constr. in Will Cnty., Il Midwest Generation, LLC-Petition for Line Crossing Auth. Under 49 U.S.C. 10901(d)*, No. 34060, 2002 WL 437218, at *1 (STB Mar. 20, 2002), modified, Fed. Carr. Cas. (CCH) ¶ 37107 (STB Oct. 3, 2002); *City of Austin, Texas—Acquisition—Southern Pacific*

*Transportation Co.*, FD No. 30861(Sub-No. A), 1986 WL 1166762 (ICC Nov. 4, 1986).

The STB's cited authority, *Sonoma-Marin Area Rail Transit Dist.—Acquisition Exemption—in Marin Cnty., Cal.*, does not hold otherwise. *Sonoma-Marin* explained that a party became a rail carrier upon acquiring the physical assets of a rail line, subject to an easement for freight rail service. *See* FD 35732, 2013 WL 3601830, at *1 n.2 (STB served July 15, 2013). Crucially, it then noted that the rail carrier retained a residual common carrier obligation over that line, easement notwithstanding. *Id.* That is entirely consistent with Reading's position and contrary to the STB's insistence on active operation, which has never been the law.

Likewise, *Fla. Dept. of Transp.—Acquisition Exemption—Certain Assets of CSX Transp., Inc.* noted that a residual common carrier obligation "engages only if the primary freight carrier fails to perform." FD 35110, 2010 WL 5104870, at *6. That is precisely the point. Conrail abandoned the operating easement on a rail line it did not own. SEPTA continued operating on the line and then relinquished the easement back to Reading, whose residual obligations then "engage[d]."

Like the STB, the City collapses the STB's jurisdiction under § 10501(b)(1) and (2), arguing that because Reading is allegedly not a rail carrier, there can be no STB jurisdiction. But even the City concedes that the STB has jurisdiction over "rail lines" and not just over rail carriers (Intervenor Br. 3), referring to ICCTA, which in turn provides for STB jurisdiction under 49 USC § 10501(b)(2), which supports Reading's position that the statutory scheme envisions the STB's jurisdiction over more than transportation by active rail carriers.

That Reading has not held itself out as an active rail carrier does not preclude it from having a residual common carrier obligation.

### B. There is no requirement of an operating rail carrier for the STB to have regulatory jurisdiction over the Branch.

The Court should not consider the City's arguments that Reading could not have a residual common carrier obligation because there is no operating railroad on the Branch. Under *SEC v. Chenery,* 318 U.S. 80, 88 (1943), the Court is "confin[ed]" to reviewing "the grounds upon which the [STB] itself based its action." Because the STB did not rely on the City's novel theory that someone must be actively operating a rail line in order for residual obligations to exist, that theory cannot be a basis for

affirmance. *Mitchell v. Christopher*, 996 F.2d 375, 378 (D.C. Cir. 1993). In any event, the City's arguments are mistaken.

There is no requirement that a rail carrier be operating for the owner of the line to have residual common carrier rights or obligations or for the line to remain under STB jurisdiction as the City suggests. Intervenor Br. 12, 14, 26, 28. *Victor Wheeler, et al.--Petition for Declaratory Order--Rail Line in Erie Cnty., Pa Bessemer & Lake Erie R.R. Co.—Abandonment Exemption--in Erie Cnty., Pa*, No. 1FN1OFN, 2008 WL 3971090 at *5 (S.T.B. Aug. 26, 2008). It is well-settled that the STB can have jurisdiction over properties where there are no operating trains, no accessible tracks, and no connection to the rail network. *R. J. Corman R.R. Prop., LLC-Abandonment Exemption-in Campbell Cnty., Tenn.*, No. AB 1296 (SUB-1X), 2024 WL 896881, at *2 (STB Mar. 1, 2024); *Consol. Rail Corp.-Abandonment Exemption-in Hudson Cnty., N.J. CSX Transp., Inc.-Discontinuance of Serv. Exemption-in Hudson Cnty., N.J. Norfolk S. Ry. Co.-Discontinuance of Serv. Exemption-in Hudson Cnty., N.J.*, No. AB 167 (SUB-1189X), 2022 WL 3595013, at *1-2 (STB Aug. 18, 2022); *Angeles A. Zorzi, Tr. of the Angeles A. Zorzi Living Tr., & Antonio Aja, Jr. & Virginia D. Aja, Trustees of the Antonio Aja, Jr. Tr. & the*

*Virginia D. Aja Trust Petition for Declaratory Order*, No. FD 36016, 2017 WL 431330, at *1 (STB Jan. 30, 2017); *Norfolk & W. Ry. Co.--Abandonment Exemption—Between Kokomo & Rochester in Howard, Miami, & Fulton Ctys.*, No. AB-290 (SUB 168X), 2005 WL 1030535, at *5-7 (STB May 3, 2005); *Trustees of Diocese of Vermont v. State*, 145 Vt. 510, 496 A.2d 151 (1985); aff'd sub nom *Preseault v. ICC*, 494 U.S. 1, 9–10 (1990). A property remains under the STB's jurisdiction until it is abandoned under 49 U.S.C. § 10903. *Id.*

The City is also wrong (Intervenor Br. 12) that the STB does not have jurisdiction over property owned by noncarriers. *Midwest Generation, LLC*, 2002 WL 437218, at *1; *City of Austin*, 1986 WL 1166762. The STB relies on its *State of Maine* doctrine to argue otherwise, but that doctrine says no such thing. Under *State of Maine*, a state agency's purchase of a railroad's physical assets does not make the agency a federally regulated rail carrier ***if*** the selling freight carrier retains a permanent, exclusive freight rail operating easement together with the common carrier obligation on the line. *State of Maine, Dep't of Transp.-Acquisition & Operation Exemption-Maine Cent. R.R. Co.*, 8 I.C.C.2d 835 (I.C.C. May 20, 1991). The critical fact in the case was the

retained common carrier obligation. The STB held that it did not consider the transaction to constitute the acquisition of a "railroad line" within the meaning of § 10901(a)(4) because "no common carrier rights or obligations [we]re being transferred." *Id.* at 837. The agency in fact distinguished the situation where a noncarrier acquires full ownership of the line and therefore acquires the residual common carrier obligation even though a rail carrier would be operating on the line (*id.* at 838, n.6), which is more analogous to Reading's situation.

The City also makes sweeping, conclusory statements that because Reading is not a railroad, the STB does not have jurisdiction over Reading's interest in Branch. Intervenor Br. 25-26. The City is wrong for two reasons. First, Reading's assertion in *Schweitzer v. Consol. Rail Corp.*, 65 B.R. 794 (E.D. Pa. 1986), that it was not a railroad employer of certain plaintiffs had nothing to do with its residual common carrier obligation. *Schweitzer* was a bankruptcy proceeding involving claims by former Reading rail employees for asbestos exposure. Reading explained that it should not be liable because Reading had transferred operational interests to Conrail and had ceased to operate rail. Pet. for a Writ of Cert., *Schweitzer*, 1985 WL 696137, at *4; *see also Schweitzer*, 65 B.R.

at 797, 799, 805. The question of which company was an employer for Federal Employers' Liability Act ("FELA") purposes has nothing to do with scope of Conrail's abandonment. In any event, the court rejected Reading's argument, holding that "the provisions [of the Rail Act] reveal that Congress intended to burden Conrail with only limited obligations that originated with the debtor's rail activities." *Id.* at 801. Thus, even for FELA employment purposes, Reading had residual obligations, underscoring that Reading did not transfer all rail interests and obligations to Conrail.

Second, the City's argument that Reading's "subsequent conduct" "confirm[s]" it had no expectation that rail service would ever operate again does not replace the statutory requirement of abandonment. Intervenor Br. 27-28. The STB has previously rejected this type of de facto abandonment argument, making clear that a party can only abandon a line through the statutory process. *See, e.g., Conrail in Hudson Cnty.*, 2022 WL 3595013, at *1-2; *Landowners Motion for Declaratory Order & Injunctive Relief*, , 2020 WL 468384, at *5 (STB Jan. 24, 2020); *Angeles A. Zorzi, Tr.*, 2017 WL 431330, at *1, 6; *Victor Wheeler,* 2008 WL 3971090, at *5.

## IV. Conrail's abandonment did not eliminate regulatory jurisdiction over the Branch.

### A. The 3R Act did not extinguish Reading's rail interests in the Branch and did not remove it from STB jurisdiction.

The STB and City overstate the effect of the 3R Act and do not acknowledge the separate rail interests, only one of which was abandoned here.

The 3R Act does not extinguish all residual rail interests or strip non-operating owners of their rail interests or obligations. To the contrary, the STB has concluded that a branch of a rail line originally conveyed pursuant to the 3R Act and then conveyed to a non-rail LLC was still subject to the STB's jurisdiction and required abandonment under 49 U.S.C. § 10903 even though rail operations no longer occurred and tracks had been removed. *See Conrail in Hudson Cnty.*, 2022 WL 3595013, at *1-2.

Nor did the 3R Act's process with respect to the bankrupt railroads transform the abandonment rule. Resp. Br. 23. Bankruptcy did not forever remove the agency's authority over railroads or lines. 45 U.S.C. § 791(b)(4) provides that STB's "powers and duties of the [agency] under section 77 of the Bankruptcy Act, with respect to a railroad in reorganization . . . shall cease" when a bankrupt railroad conveys its rail

assets to a solvent company. Each of the cases the STB cites relies expressly on Section 791(b)(4). *Matter of Penn Cent. Transp. Co.*, 553 F.2d 12, 15 (3d Cir. 1977); *In re Bos. & Me. Corp.*, 600 F.2d 307, 311 n.10 (1st Cir. 1979). These cases do not stand for the proposition that the ICC or STB forever lost jurisdiction over rail properties that were conveyed through the 3R Act. Indeed, the authority is to the contrary. *See City of Jersey City v. Consol. Rail Corp.*, 968 F. Supp. 2d 302, 307–08 (D.D.C. 2013), aff'd, No. 13-7175, 2014 WL 1378306 (D.C. Cir. Feb. 19, 2014).

Similarly, the "all right, title, and interest" language in the 3R Act also does not extinguish Reading's rights and obligations. Resp. Br. 26; Intervenor Br. 21. Conrail simply could not abandon what it did not own. The STB concedes that Conrail held only an operations easement and Reading retained fee to the underlying rail line—precisely the mixed-interests structure which courts and the STB have found continued STB jurisdiction. Resp. Br. 1; *Scioli Turco, Inc.*, 2023 WL 7646535, at *4; *Beaufort R.R. Co., Inc.--Modified Rail Certificate*, FD No. 34943, 2009 WL 2170143, at *5 (STB July 20, 2009); *Victor Wheeler, et al., 2008 WL 3971090, at *5; Midwest Generation, LLC*, 2002 WL 437218, at *1.

The cases the STB cites characterizing Reading's remaining interests as non-rail property interests or Reading as a noncarrier (Resp. Br. 23) do not say that Reading did not retain a residual carrier obligation and do not hold that the Branch was no longer under the STB's jurisdiction after Conrail's limited 1983 abandonment. In *Matter of Reading Co.*, 115 F.3d 1111, 1114 (3d Cir. 1997), the court concluded that Reading could not be liable to Conrail for contribution under CERCLA. But CERCLA's far-reaching standard is different than abandonment. And, as explained *supra*, *Schweitzer* involved the question of discharging liability for FELA claims. *Schweitzer*, 65 B.R. at 799. Neither case has anything to do with (1) Conrail's limited abandonment, (2) whether Reading retained a residual common carrier interest, or (3) whether the STB has jurisdiction over the Branch.

The City sets forth a conclusory theory of congressional intent to stretch the scope of Conrail's abandonment beyond the rights Conrail possessed. Intervenor Br. 20-22. The City contends that Congress did not intend for Reading or other rail carriers "conveying property to Conrail to retain any rights with respect to railroad operations on that

property." *Id.* at 21. The City does not support that assertion with any authority.

In an argument precluded by *Chenery*, the City also makes a number of proclamations with respect to a rail carrier's obligations to misleadingly suggest that because Reading is not doing these things, it could not have a residual common carrier obligation and that the Branch is no longer regulated. Intervenor Br. 18. The City cites no authority for the proposition that certain actions are affirmatively required and fails to substantively distinguish the cases holding that nonrail carriers can have a residual common carrier obligation. *See* Opening Br. 31.

The City also theorizes that because NERSA's abandonment process did not speak to discontinuances, the 3R Act must have intended to forever strip reorganized railroads of all interests. Intervenor Br. 22. This argument is again forfeited and precluded by *Chenery*. In any event, the City's conjecture that Congress envisioned easement holders would only ever abandon lines rather than discontinuing use of them contradicts § 10903, which provides for discontinuance and which Conrail has taken advantage of. *Consol. Rail Corp.-Discontinuance Exemption-*

*in Montgomery & Bucks Ctys., Pa*, No. AB-167 (SUB 1177X), 1997 WL 54949, at *1 (STB Feb. 3, 1997).

### B. The STB's "line sale" argument is improper under *Chenery*, and the analogy is legally and factually incorrect.

Apart from advocating a rationale on which the agency did not rely, the STB's argument that conveying an operations easement to Conrail constituted a line sale is mistaken.

A "rail line" comprises many rights, and the regulatory scheme requires proper abandonment of all rail interests. *See Beaufort R.R. Co., Inc.*, 2009 WL 2170143, at *5. In its abandonment, Conrail explained it was only abandoning its operations on a line it did not own. Application at 2 (J.A.0022). It would make no sense for an easement holder to be able to abandon anything more than its easement.

While a line sale can transfer ownership and the entire common-carrier obligation, a sale is not the only type of conveyance. And Reading's conveyance of operations to Conrail did not transfer the whole of the Branch. The STB relies on line-sale precedent while simultaneously conceding that Reading retained the underlying property and dismissing the fact that Conrail admitted it did not own the line. The cases it cites are therefore inapt. In *Seminole Gulf Ry., Inc.*--

*Abandonment Exemption--in Lee Cnty., Fl*, for example, Seminole Gulf acquired the full common carrier obligation along with the track and rail facilities. *See* No. AB-400, 1994 WL 708551, at *4 (ICC Dec. 12, 1994), vacated in part sub nom. *Seminole Gulf Ry., Inc. -- Abandonment Exemption -- in Lee Cnty., Fl.*, No. AB-400, 1995 WL 139760 (ICC Mar. 30, 1995). The STB has recognized the varied rights comprising a rail line, yet it failed to apply that rule to Reading's retained interests after subtracting Conrail's operating easement.

*Victor Wheeler,* 2008 WL 3971090, at *5 is consistent with this rule. Resp. Br. 25; Intervenor Br. 29. Like this case, *Victor Wheeler* involved the conveyance of operating rights pursuant to the 3R Act. When the operator sought to discontinue its operations, the STB held that the line owner, E&P, "continued to hold a residual common carrier obligation to operate the line after Penn Central was relieved of its obligation. Thus, the line remained subject to our jurisdiction because E&P had not obtained abandonment authority." *Id.* This was true even though no rail carrier was operating on the line. *Id.* at 5-6. There, as here, the transfer of operating rights was not equivalent to selling the line outright.

The STB's line sale argument is barred under *Chenery* but also fails on the merits. There was simply no sale.

### C. Evidence supports Reading's position that Conrail could not abandon what it did not own.

The dispositive question is which interests were abandoned. Conrail's abandonment extinguished Conrail's obligation, not the whole of the Branch still under the STB's jurisdiction. NERSA's abandonment provision, 45 U.S.C. § 748, makes clear that Conrail's application was limited to lines "which are part of the system of the Corporation." This means that Conrail could only apply to abandon its interest—an operations easement on a rail line that it did not own. Under the STB's own "line" definition, it should have analyzed whether any remaining component persisted. It failed to do so.

Where only the abandonment of an operator's easement is before the agency, the STB's jurisdiction over the owner's residual interests or obligations or over the rail line facilities is not extinguished absent an abandonment procedure related to those interests. *Victor Wheeler*, 2008 WL 3971090, at *5; *Beaufort R.R. Co., Inc.*, 2009 WL 2170143, at *5. STB precedent avoids situations that would result in a rail line owner

automatically losing its rail interests when a rail carrier on a line ceases operations. *Beaufort R.R. Co., Inc.*, 2009 WL 2170143, at *5.

Here, the FSP transfer conveyed only a freight operating easement to Conrail, which SEPTA then used for its passenger operations before eventually relinquished it back to Reading. Pet., Ex. D (*Scioli Turco* opinion) 2, 6 (J.A.0037, J.A.0041). But Reading maintained ownership of the full line. Conrail successfully applied to abandon only its "operation of the lines," acknowledging it did not own the line. Application at 2 (J.A.0022).

The STB and City discounted these facts and SEPTA's involvement by invoking the commuter exception (STB lacks jurisdiction over "public transportation provided by a local government authority"). Resp. Br. n.3, 29-30; Intervenor Br. 32. But no one argues that the STB had jurisdiction over SEPTA's operations. Instead, SEPTA's use proves that Conrail did not abandon Reading's Branch entirely. It is Reading and its Branch, not SEPTA, that come within STB's jurisdiction, and the STB fails to respond to the way in which SEPTA's use confirms the limited scope of Conrail's abandonment.

The STB also tries to excuse its failure to address record evidence in the form of Mr. DiArenzo's declaration by claiming it did not actually constitute any evidence the STB should have considered. Resp. Br. 21-22. That makes no sense. The declaration came from a former Conrail executive who discussed the limits of Conrail's abandonment and the remaining interest belonging to Reading, both of which were relevant to deciding the City's Petition. The STB *did not mention* this declaration, which falls below the APA's standard for reasoned decision-making. *Briggs ex Rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001) (even on substantial-evidence review, an agency "may not ignore evidence that does not support [its] decision"). The STB's post-hoc efforts in this appeal to excuse the agency's failure do not suffice.

The STB failed to meaningfully address material record evidence related to the scope and effect of Conrail's abandonment. In doing so, the STB wholly failed to address a significant aspect of the case. *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).

## V. The STB and City Mischaracterize Reading's Reliance On *Scioli Turco*, Its Holding, And The STB's Responsibility To Meaningfully Address It.

The STB and the City both argue for the first time that *Scioli Turco* was wrongly decided. They are mistaken on the merits, and the belated argument is no substitute for addressing that case in the agency proceeding.

### A. *Scioli Turco* Is Persuasive Authority Addressing the Identical Issues.

Although Reading never claimed the STB was "bound" by the decision, Reading consistently argued *Scioli Turco* was on point and the STB should follow it. Reply 3, 9, 10-12, 14, 16 (J.A.0070, J.A.0076, J.A.0077-0079, J.A.0081, J.A.0083); Reply to MTS 3, n.3 (J.A.0263). In terms of issue and claim preclusion, Reading argued only that those doctrines could potentially preclude an adverse abandonment by the City. Reply 12 (J.A.0079). The STB's focus on that argument rather than substantively addressing the actual case was error.

*Scioli Turco* addressed the same physical rail assets and the same legal questions at issue here. The STB should have explained why it did not follow its reasoning. *Tesoro Ref. & Mktg. Co., LLC Petition for Declaratory Order*, No. FD 36041, 2016 WL 6809953, at *4 (STB Nov. 14,

2016); *Jicarilla Apache Nation v. DOI*, 613 F.3d 1112, 1120 (D.C. Cir. 2010); *Flores v. Sec'y of Health, Educ. & Welfare*, 228 F. Supp. 877, 877–78 (D.P.R. 1964).

### B. The STB and City mischaracterize *Scioli Turco*.

The *Scioli Turco* decision was not based solely on the court's distinction between a NERSA and 49 U.S.C. § 10903 abandonment. Resp. Br. 10. Rather, the court found Conrail abandoned only its operations, the line was "part of a rail line" owned by Reading, and it remained under the STB's jurisdiction. *Scioli Turco, Inc.*, 2023 WL 7646535, at *3-5.

The STB tries to avoid the import of the opinion by suggesting it did not address a common carrier obligation. Resp. Br. 33. That misses the mark. *Scioli Turco* did not need to address that obligation because it held that the STB's jurisdiction is not limited to transportation by rail carriers. *Scioli Turco, Inc.*, 2023 WL 7646535, at *3. The STB takes the opposite position in this case, artificially limiting its jurisdiction to active rail transportation by rail carriers. The Supreme Court has held that self-imposed limits of that type violate the APA. *Util. Air. Reg. Grp. v. EPA*, 573 U.S. 302, 320-21 (2014). *Scioli Turco* interpreted the law

correctly, and the STB could have avoided its mistaken break with precedent by engaging with that reasoning.

Finally, the STB rewrites history by imagining that it did, in fact, consider *Scioli Turco* but disagreed with its reasoning. Resp. Br. 33-34. That is not accurate. Rather, the STB only explained why res judicata and collateral estoppel did not apply. Order 6-7 (J.A.0277-0278). The STB then summarized the decision as acknowledging the STB's jurisdiction over the abandonment of rail lines. But the STB reasoned that its "previous issuances" (referring to Conrail's abandonment) removed its jurisdiction. Order 7 (J.A.0278). That is the extent of the STB's analysis. It did not explain why the Eastern District of Pennsylvania was wrong to conclude the Conrail's abandonment of its easement did not have the effect the STB assumed. The lack of a meaningful response to the district court in which the Branch is located is a failure of reasoned decision-making.

## VI. Reading Did Not Have An Affirmative Duty To Take Action To Preserve Its Rights.

The STB's decision stating Reading never asserted a common carrier obligation implies that Reading was required to assert one or take

other steps to preserve its regulated status. Order at 9-13 (J.A.0280-J.A.0284). But no statute imposes such a duty.

The City also suggests Reading was required to take affirmative steps for the STB to retain jurisdiction. Intervenor Br. 28. But the authority is clear. A rail line remains under the STB's jurisdiction until abandoned under 49 U.S.C. § 10903, and that has not happened here. Neither the City nor the STB has any authority for amending the statutory abandonment procedures to create a second path to abandonment that kicks in when the line owner does not take certain (unwritten) actions demonstrating its ownership. Congress provided the exclusive means of abandonment, and it did not occur here.

## CONCLUSION

The core of this case is the effect of Conrail's abandonment of its operating easement in 1983. Because that action—by its terms, as a matter of law, and in practice—did not extinguish Reading's larger bundle of rights and obligations, the Branch remained within STB's jurisdiction. Unless and until Reading complies with the statutory abandonment process, its ownership remains intact, and the STB retains jurisdiction. The STB and the City try desperately to create new and

unheralded methods of abandonment, but each of them fails. For lack of legal authority and because the STB's reasoning was arbitrary and capricious, this Court should vacate the decision below.

Respectfully submitted,

June 22, 2026

Dominic E. Draye
*Counsel of Record*
GREENBERG TRAURIG, LLP
2101 L Street, N.W.
Suite 1000
Washington, DC 20037
(202) 331-3168

John Voorhees
GREENBERG TRAURIG, LLP
1144 15th Street
Suite 3300
Denver, CO 80202
(303) 685-7465

Jennifer Bartlett
GREENBERG TRAURIG, LLP
2200 Ross Avenue
Suite 5200
Dallas, TX 75201
(214) 665-3729

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations in Federal Rule of Appellate Procedure Rule 28.1. It contains 6,362 words, excluding the portions of the brief exempted by Circuit Rule 32(e)(1). Fed. R. App. P. 32(a)(7)(B); D.C. Cir. R. 32(e)(1). It is set in double-spaced, size-14 Century font. Fed. R. App. P. 32(a)(5).

/s/ *Dominic E. Draye*
Dominic E. Draye

## CERTIFICATE OF SERVICE

Pursuant to Rule 25 of Federal Rules of Appellate Procedure, I hereby certify that on June 22, 2026, I caused to be electronically filed the foregoing with the Clerk of the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ *Dominic E. Draye*
Dominic E. Draye